POTTER HANDY LLP
Mark Potter, Esq., CA SBN 166317
Russell Handy, Esq., CA SBN 195058
Cara Townsend, Esq., CA SBN 220356
Barry Walker, Esq., CA SBN 195947
100 Pine Street, Ste 1250
San Francisco, CA 94111
Phone: (415) 534-1911
Email: ServeHT@potterhandy.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Jane Doe (UB-00002),**<br><br>Plaintiff,<br><br>v.<br><br>**Uber Technologies, Inc.;**<br>**Rasier, LLC;**<br>**Rasier-CA; LLC; and**<br><br>DOES 1-10,<br><br>Defendants. | Case No.<br><br>**Complaint for Damages:**<br><br>**18 U.S.C. § 1595**<br><br>**18 U.S.C. § 2255**<br><br>**California Civil Code § 1708.5**<br><br>**Demand for Jury Trial** |

**TABLE OF CONTENTS**

PLAINTIFF'S COMPLAINT ........ 3
INTRODUCTION ........ 3
PARTIES ........ 3
JURISDICTION AND VENUE ........ 5
SEX TRAFFICKING OVERVIEW ........ 5
GENERAL ALLEGATIONS ABUT UBER ........ 8
STATEMENT OF FACTS ........ 17
Plaintiff was Trafficked ........ 17
The Uber Transportation System ........ 19
PUNITIVE DAMAGES ........ 70
FIRST CAUSE OF ACTION: TVPRA ........ 72
SECOND CAUSE OF ACTION: CAVRA ........ 73
THIRD CAUSE OF ACTION ........ 76
PRAYER FOR RELIEF ........ 78
JURY DEMAND ........ 79

## PLAINTIFF'S COMPLAINT

## INTRODUCTION

1. Plaintiff, Jane Doe (UB-00002), files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred from the years 2015 through 2016, beginning when she was 17 years of age and the sexual battery that she experienced at the hands of Uber drivers at the age of 17. Plaintiff was subjected to untold atrocities, including rape, verbal and physical attacks, humiliation, fear, and sexual assault.
2. Defendant Uber was an integral component of the trafficking venture. Through its platform and drivers, Uber repeatedly transported Plaintiff, a minor, to and from locations where unlawful sexual commercial transactions, i.e., rape, were arranged. The circumstances of these rides made the nature of the activity apparent to Uber's drivers, and in multiple instances, Uber drivers personally participated in the rape of the Plaintiff.

## PARTIES

3. Plaintiff is a natural person who is a resident and citizen of Oakland, California.[1]
4. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16). Due to the sensitive and intimate nature of the issues, Plaintiff requests that this Court grant a protective order pursuant to

[1] Contemporaneously with the filing of this Complaint, Plaintiff is filing a Motion to Proceed Anonymously based on the inherently intimate and personal nature of the allegations. Plaintiff will provide her identity to counsel for the defendants upon entry of a protective order.

Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.

5. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties. However, there are exceptions when the issues involved are of a sensitive and highly personal nature. For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.

6. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

7. Defendant Uber Technologies, Inc. is a Delaware corporation with its principal place of business at 1515 3rd Street, San Francisco, California, 94158.

8. Defendant Rasier, LLC, is a Delaware limited liability company. On information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc. Rasier maintains its principal place of business at 1515 3rd St., San Francisco, California, 94158. On information and belief, Rasier, LLC is entirely controlled by Uber Technologies, Inc.

9. Defendant Rasier-CA, LLC, is a Delaware limited liability company. On information and belief, Rasier-CA is a wholly owned subsidiary of Uber Technologies, Inc. Rasier-CA maintains its principal place of business at 1515 3rd St., San Francisco, California, 94158. Rasier-CA is the one of the primary Uber entities that has interfaced with the California Public Utilities Commission, and so its activities affect Uber passengers in all states. On information and belief, Rasier-CA is entirely controlled by Uber Technologies, Inc.

10. Defendants Uber Technologies, Rasier, and Rasier-CA are collectively referred to as "Uber."

11. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff does allege that the defendants are responsible for the acts alleged herein, including under an alter-ego theory. Plaintiff will seek leave to amend this Complaint, as appropriate, to allege the true names and capacities of these fictitiously named Defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

## JURISDICTION AND VENUE

12. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA, 18 USC 1595. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because both the plaintiff and the defendant reside in this district.

## SEX TRAFFICKING OVERVIEW

14. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

15. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

16. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

17. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

18. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

19. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences

are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

20. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

21. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

22. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

23. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

24. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

25. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

26. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, use ride-share companies to transport victims and deliver their sexual exploitation, and internet and social media platforms to recruit victims and market their services. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

27. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## GENERAL ALLEGATIONS ABOUT UBER

28. In 2009, when Uber was founded, the general public considered it unreasonably dangerous for a young woman (or any solo traveler for that matter) to get into a complete stranger's private car in order to travel to a

specific destination. That would have been considered hitchhiking. A foreseeable risk of hitchhiking was the potential for sexual assault.

29. If someone needed a ride, one approach that had long been considered reasonably safe was to hail a licensed taxi. For decades, local authorities have heavily regulated taxi drivers and taxicabs to provide safeguards and protections for prospective passengers against unscrupulous or predatory drivers. For example, currently in San Francisco, an applicant to become a taxi driver must: submit fingerprints that are checked against the California DOJ "RAP Sheet" database; pass a written exam; complete a driver training course; provide a recent photograph; submit to an alcohol and drug test; receive a negative result on the alcohol and drug test; authorize the city to obtain the results of past alcohol and drug tests; notify the city whether he or she has previously failed an alcohol or drug test; be free of any condition that might render the applicant unsafe to operate a motor vehicle; have no prior convictions of a crime that would present a risk to public safety; be at least 21; and speak, read, and write the English language. A permitted taxi driver must conspicuously display his or her permit on the outside of his or her clothing at all times while operating a taxi and show that permit to any peace officer upon request. The permit can be worn only by the driver to whom it is issued.

30. Uber first launched in San Francisco in 2010 as UberCab. At first, it used its mobile phone application to dispatch black Lincoln Town Cars and limousines, operated by licensed professional drivers who worked with regulated, licensed Charter-Party Carrier (TCP) businesses. It branded itself "Everybody's Private Driver."

31. In 2012, Uber expanded its offerings to include traditional taxi services, and also less expensive rides in unmarked "hybrid and mid-range cars in a variety of colors," still operated by licensed, regulated TCPs. It called these cheaper rides "UberX."

32. Meanwhile, in 2012, Uber noticed a small, local, San Francisco start-up company, Zimride (later re-named Lyft), that facilitated less expensive rides than Uber's by harnessing "ridesharing" where trips were provided by random laypersons rather than professional drivers. This was a radical concept, with some obvious risks. But in 2012, Lyft was growing slowly and deliberately, initially rolling out to just friends and family. It marked the cars with giant fuzzy pink mustaches and encouraged drivers and passengers to "fist bump" upon the passenger entering the car. Payments consisted of a reimbursement for gas, and a suggested donation from the rider to the driver. Lyft was candid about the fact that these drivers were not professionals.

33. Uber, which by then had expanded into markets around the world, saw in Lyft's "ridesharing" concept the potential to make a lot more money.

34. In 2013, Uber decided to start offering this novel form of application-supported transportation, where Uber would connect individuals who need a ride with individuals who have a driver's license, access to a car, and willingness to offer a ride (so-called "peer-to-peer rides" or "ridesharing"). For the first time, Uber was connecting riders with drivers who were not associated with licensed taxis or TCPs.

35. Unlike Lyft, Uber was not candid with riders that they were taking rides from random people. Uber sneaked "peer-to-peer" rides into its existing "UberX" menu option so that, when riders selected "UberX," the driver who showed up might be either a licensed professional driver in an unmarked car, or an unknown random person in an unmarked car. Nobody but Uber could tell the difference.

36. Uber was not content with a local friends-and-family market, nor with slow growth. It on-boarded a massive fleet of drivers practically overnight. It did not request donations, instead charging mandatory fares. The public did not know it, but a paradigm shift had occurred.

37. Uber had effectively monetized hitchhiking, all the while hiding that reality from riders. Uber's new transportation system was convenient and affordable for the public, and lucrative for Uber. On the other hand, Uber's business model placed a rider who was trusting in Uber's reputation, and a driver about whom the rider and Uber both knew very little, in an isolated setting (a private vehicle) with limited means for the rider to escape if something went awry. This business model foreseeably increased risk of sexual assault, especially for solo women passengers. Uber should have taken action to prevent such assaults but chose instead to pursue rapid growth at all costs.

38. In order to keep building this new industry and beat the competition, Uber needed to make the acquisition of drivers and riders as cheap and frictionless as possible. Anything that discouraged riders or drivers from using the product would hurt the bottom line.

39. First, Uber had to change the public's attitude toward getting into a private car driven by a random layperson such that there would be demand for its rides. Uber did so by assuring passengers that Uber was safe: the "safest rides on the road," "a ride you can trust," and a service that "was created to ensure reliable access to safe rides[.]"

40. Even today, Uber continues to maintain that "safety is a top priority[.]" This ubiquitous messaging generated reassurance that passengers could count on Uber to keep them safe. It removed the friction that would otherwise prevent people from using Uber's product.

41. The result is a universal understanding by the public that an Uber ride is not a ride with a stranger; it is a ride with Uber, arranged and procured by Uber, in cars operated by vetted and approved Uber drivers, and with trip monitoring and fare management exclusively within the Uber App. It is the imprimatur of a legitimate and responsible corporation—Uber— overseeing virtually every aspect of the ride that gives passengers the necessary sense of safety and

security to get into the car with an Uber driver. Based on Uber's own metrics, passengers are largely motivated by safety when choosing Uber's services.

42. Second, Uber had to circumvent the taxi industry's existing safety regulations, and minimize background checks, safety checks, and oversight of drivers, in order to rapidly recruit a fleet of non-professional drivers to meet this demand.

43. Uber's business plan required that its drivers never be treated as Uber's employees. If the drivers could establish employee status, then Uber would be on the hook for the associated costs, such as overtime, workers' compensation, unemployment insurance, etc. This motivation in turn informed the company's approach to safety. If Uber effectively deterred its drivers from misconduct, it would have demonstrated Uber's control over those drivers, thereby supporting their employment-based claims.

44. At every step, Uber's approach to safety reflected its dominant goals of recruiting riders and drivers with as little friction as possible. Uber chose to achieve growth at the expense of women's safety. When Uber launched its new transportation system, it did not hire any safety experts, nor did it spend a single minute or a single dollar thinking about how to prevent sexual assault. To this day, Uber's efforts regarding safety are primarily focused on appearing safe, not actually being safe.

45. Uber reassures riders that it uses "multi-step safety screening" of drivers, along with regular review of drivers' histories. But, unlike the taxi industry, Uber conducts background checks using the information a driver provides (name and social security number, which may or may not be that of the actual driver) and not using any biometric information (e.g., fingerprints). Uber conducts these background checks using often-sparse public databases, not the FBI database used by the taxi industry. When states (such as Maryland and Massachusetts) performed their own fingerprint-based background checks, 12-15% of drivers who were eligible under Uber's standards flunked the official

background checks. Uber knows its background checks are inadequate and knows that fingerprint-based background checks would be safer for riders. But because Uber's business requires rapid onboarding of new drivers to maintain a steady supply of rides, it will not change its practices.

46. Despite their known inadequacy, Uber relies on these flawed background checks as its sole method for screening out ill-intentioned drivers. It does not meet its drivers in person or online. It does not interview them. It does not require any references. It does not contact prior employers. There are no drug and alcohol tests. There are no exams.

47. Uber invites riders to find out more about what Uber is "doing to set safer standards." But Uber is not setting safer standards. Instead, Uber became what it is today by flouting existing standards. Uber got permission to use its inadequate background checks by first breaking the law and ignoring existing regulations that applied to taxis and limos. This let Uber offer inexpensive and convenient rides, which made it popular. Then it harnessed that popularity to force regulators to adopt lax regulations drafted by Uber.

48. In the past, Uber gained riders' trust by fraudulently advertising "the safest ride on the road," saying that it sets "the strictest standards possible" and that it "aims to go above and beyond local requirements" with "gold standard" and "industry leading" background checks. Even after it paid more than $50 million to settle lawsuits based on this fraudulent marketing, Uber never told riders the truth. Instead, Uber changed its safety representations to be increasingly vague, such as asserting: "At Uber, Safety Never Stops."

49. Uber knows that its transportation system is particularly high risk for intoxicated riders, especially intoxicated women. Nonetheless, Uber's advertising disproportionately targets women with dedicated ad campaigns and webpages devoted to "driving women's safety forward." Its marketing photos and videos predominantly feature smiling women riding in Ubers.

50. Uber also specifically markets its rides as a safe, smart transportation option for intoxicated riders. Uber heavily promotes its rides, on New Year's Eve and other holidays, as a safe way to get home after an evening of drinking. This marketing is broadly targeted, appearing in such innocuous places as Safeway grocery stores. Uber engages in joint marketing with alcohol manufacturers and local bars, telling women that it is ok to have another drink and be assured they have a ride home.

51. Uber knowingly puts drunk women riders at risk. And when those riders report sexual assaults in court, Uber uses the fact of their intoxication to question their credibility.

52. To maintain a false sense of security, Uber builds low-cost features that superficially and superfluously address safety, such as a button to call emergency responders from inside the Uber App. (Never mind the ease of simply pressing "9-1-1" on one's phone) Uber knows that many of its passengers (1) did not order the ride themselves and therefore cannot use this feature, (2) their cell phone batteries are dead, or they cannot find them; or (3) they are intoxicated and unable to properly navigate the App feature. Uber avoids taking more meaningful steps readily available to it as a resource-rich tech company with complete control over the ride environment and experience.

53. One such step would be requiring cameras in cars. For years, Uber has known that mandatory cameras (which the driver cannot disable during a trip) would effectively deter sexual assault. It knows that cameras would help women report sexual assaults with more confidence that they could prove their claims. But it also knows that requiring cameras would slow onboarding of new drivers, discourage some drivers from signing up (and so decrease Uber's revenue), and jeopardize Uber's argument that drivers are independent contractors. Cameras might also make it more difficult to find passengers

because they would be reminded, contra Uber's messaging, that Uber's product carried dangerous risks. For these reasons, Uber does not mandate cameras.

54. Uber does not adequately monitor drivers' safety performance. Uber makes it hard for riders to report sexual assault, since it does not want to disclose the true safety risks to regulators or the public. When a rider gives a low rating to a driver, Uber presents a menu with at least 44 different options (e.g., "fast driving," "unpleasant car smell," "talked too much," "didn't follow map") but the menu does not include sexual misconduct, sexual harassment, or sexual assault. By impeding reports of sexual assault, Uber fails to protect riders from drivers it should terminate. Uber also deprives itself of the true data on sexual assault, preventing it from meaningfully studying prevention.

55. Uber also misleads riders by displaying each driver's purported overall rating (out of five stars) next to the driver's total number of trips. But the star rating actually reflects only the past 500 trips, not a complete track record. Moreover, Uber drops some low reviews from the overall star rating it displays. It does not tell riders that this information is incomplete and inflated.

56. Uber does not protect riders from drivers who have shown themselves to be a threat. For most of its years in business, Uber's official policy has been to require more than one sexual assault complaint before terminating a driver. Depending on how much money a particular driver was making for Uber, Uber would sometimes tolerate three or four sexual assaults before terminating the driver. It is unknown how many of these drivers, who received "free passes" for one, two, or three sexual assaults, are still driving for Uber.

57. Even though sexual assault is underreported, and even though Uber discourages reporting, thousands of women have come forward to say they were sexually assaulted during Uber rides. Uber refuses to take any responsibility for allowing these assaults to occur.

58. In fact, Uber's legal position is and always has been starkly different from what it tells the public. Uber pretends that it takes responsibility for the safety of its rides. Its in-App welcome screen long promised prospective customers, "Safe, reliable rides in minutes." When people view the Uber App in the app store, they see the tagline, "ride with Uber." To this day, Uber's website proclaims: "Ride with confidence. The Uber experience was built with safety in mind," "we're dedicated to helping you move safely," "our commitment to safety," and "at Uber, Safety Never Stops."

59. In contrast to these representations, Uber has aggressively lobbied for the enactment of laws and regulations saying that Uber is merely a technology platform, or a middleman between riders and drivers, and that it does not control, direct, or manage its drivers and so cannot be held culpable for what occurs during a ride. Uber spends over $6 million annually in the U.S. alone on these lobbying efforts.

60. For Uber, sexual assault and harassment in its vehicles is the price of doing business. This philosophy has been its consistent view since at least 2014, and it continues to be its view today. When women are assaulted on its platform, Uber does not take responsibility but instead blames its drivers and even the passengers themselves. Uber defends against liability by pointing to resources telling women they should "take an active role in increasing your safety or the safety of those you care about." As if it were passengers' responsibility to avoid dangerous Uber drivers, rather than Uber's responsibility to provide the safe ride it promised.

61. Uber's litigation strategy is to blame everyone except Uber. Uber blames the driver, even though Uber's marketing position is that passengers ride "with Uber" and that Uber will keep them safe. And Uber blames passengers for not reporting their assaults to law enforcement, even though Uber makes it as difficult as possible for them to do so.

62. This attitude dates back to Uber's earliest days but did not change with the company's much-touted 2017 leadership reset. Uber's removal of its founding leadership rehabilitated its reputation and enabled a lucrative IPO. But it did little to protect victims of sexual misconduct. Worse: Uber's improved PR skills reinforced and spread its message of a "safe ride," reassuring women that they were protected using the company's product.

## STATEMENT OF FACTS

63. Plaintiffs assert that each fact stated in this Complaint was and is true at all relevant times, past and present, unless otherwise specified.

**Plaintiff was Trafficked**

64. At the age of seventeen, Plaintiff was homeless on the street of Los Angeles and became ensnared in a sex trafficking operation. Her trafficker, who went by the alias "DD", operated an organized business trafficking underage women in the LA area and Las Vegas, Nevada for commercial sex services. DD used online advertisements, on sites including Backpage.com. As part of this operation Plaintiff was trafficked in a range of hotels, vehicles, and private residences. It was a high-volume operation, and Plaintiff was frequently transported by Uber drivers.

65. Plaintiff was assigned the aliases "P," "K," and "S." Under these identities, and images of the Plaintiff, her traffickers created and managed online advertisements for commercial sex between 2015 and 2017. These postings branded Plaintiff as a commodity and attracted buyers.

66. During this period Plaintiff was stripped of possessions, her identification was confiscated, and her access to communication devices was weaponized against her. She was closely monitored, including by other trafficked women, and subjected to psychological manipulation, threats, substance dependency, and repeated sexual abuse by her trafficker.

67. Plaintiff was frequently confined alone in hotel rooms for extended intervals, awaiting instructions or the return of her trafficker. Drugs and alcohol were administered to keep her awake (or calm her down) and enabled Plaintiff to meet a high volume of buyers. These conditions resulted in malnourishment, visible fatigue, and profound psychological harm. Most of the time she was under the influence of drugs or alcohol.

68. Plaintiff was routinely sent by Uber to different locations, at the direction of her trafficker and the buyer. Approximately half of "outcall" dates involved transport by Uber. On most rides Plaintiff was a minor and unaccompanied by any adult. She did not arrange the rides. They were not done from any account that she owned or used.

69. Plaintiff entered the Uber rides dressed for the job for which she was being transported – high heels, short skirts, small tops. Frequently she would participate in conversations that explained or revealed the purpose for making the trip. The Uber drivers were well aware of where she was going and the purpose for her trips. In Las Vegas, because her rides often originated near an Air Force base, many of the Uber drivers were either military or military adjacent. While still a minor, several of the Uber drivers negotiated for and received sex services from Plaintiff.

70. .Plaintiff's period of trafficking was disrupted by her own arrest.

71. As a direct result of being raped and trafficked, by Uber and others, as a minor and young adult, Plaintiff has suffered lasting psychological, emotional, and relational harm. The trauma has manifested in chronic anxiety, depression, substance dependency, and profound difficulties in maintaining stability. These injuries continue to impact her in profound and ongoing ways, constituting permanent damage to her wellbeing.

**The Uber Transportation System**

72. Uber is a transportation company headquartered in San Francisco, California that pioneered an app-based transportation system that eventually spread through the United States and around the world.

73. Uber provides an online and mobile application—the “Uber App.” The Uber App connects persons seeking transportation with persons who use their personal vehicles to provide transportation in exchange for compensation. Users request and pay for rides through the customer version of the Uber App. Drivers are notified of requested rides, which they can then accept and be compensated for by Uber through the driver version of the Uber App. Both versions of the app connect to the same website, Uber.com, which is Uber’s website.

74. Anyone from the public may download either version of the Uber App for free.

### i. Uber maintains complete control over its transportation system, including the Uber App, and so has the ability and responsibility to prevent sexual misconduct facilitated by that system

75. Uber is the designer and operator of its transportation system, and the designer, manufacturer, operator, and seller of the Uber App that supports that system.

76. Uber alone decides who can access the Uber App.

77. On the passenger end, Uber decides who will be approved, and on what terms, to be an Uber account holder and thus be able to use the Uber App. This includes promulgating and enforcing rules regarding age restrictions, number of accounts per person, assignability and transferability of the account, and the ultimate right to approve, delete, or deactivate accounts.

78. On the driver end, Uber alone decides which drivers it will recruit, who will receive access to its transportation platform, and on what terms. It chooses whether and how to screen those drivers. It alone decides what background checks to use, how far back to look, what prior offenses will be disqualifying, whether and how to onboard drivers in the absence of meaningful background

checks (e.g., when a driver has recently moved to the jurisdiction where the background check is conducted), whether to conduct in-person interviews, whether to conduct in-person trainings or orientations, whether to have any in-person interactions with drivers, whether to conduct drug alcohol screenings, and whether to require training or have drivers take exams.

79. Uber passengers and Uber drivers are subject to Uber's policies and procedures, of which Uber has ultimate authority to enforce.

80. Uber designs the way in which the entire transportation experience will work.

81. Uber selects which driver will be matched with which rider, and the basis on which that match will occur.

82. Uber designs the ride pick-up experience. It sets the pick-up and drop-off location. It decides what trade dress, markings, decals, devices, and in-App tools will be used for the driver and rider to recognize one another.

83. Uber decides which aspects of a driver and rider's transportation experience (including but not limited to requesting a ride, requesting a ride for someone else, accepting a ride, locating a rider, locating a driver, getting into a driver's vehicle, driving to a destination, making stops, changing destinations, adding multiple destinations, arriving at a destination, and disembarking) will be supported by buttons, controls, information, and other tools within the Uber App, or by technology, devices, and services external to the Uber App.

84. When users arrange transportation with the Uber App, they input their destination and request a driver. The Uber App then uses an algorithm to match the user with a nearby driver.

85. Uber drivers must be logged onto the Uber App and indicate their ability to provide rides to be matched with a rider.

86. Uber has complete control over the amount of the fare, including additional fees and when to implement dynamic pricing.

87. Likewise, Uber controls all promotional offers, vouchers, and discounts (e.g. Uber Cash) and how they can be applied to a particular fare.

88. If a rider chooses to cancel a trip, it must be canceled through the Uber App and Uber will determine if a cancellation fee will be charged and in what amount.

89. If a rider chooses to modify a trip, such as adding additional stops, it must be modified through the Uber App and Uber will determine if additional fees will be charged and in what amount.

90. Uber collects GPS data and information on its drivers whenever they are using the Uber App, and on riders from at least the time they request a ride until five minutes after they are dropped off.

91. Uber decides what information will be provided to the passenger about the Uber driver and vice versa. In doing so, Uber has decided that limited information should be provided. Passengers receive only a photo of the Uber driver, along with the driver's first name, vehicle type and license plate number.

92. Uber does not provide drivers and riders with one another's contact information. Instead, all communications must be made through, or to, Uber. Uber decides what communications can be sent and when. After a ride, for example, a rider cannot request a refund directly from a driver, but only from Uber.

93. Uber handles and decides the outcome of all complaints, issues, and grievances regarding the Uber ride.

94. When an Uber driver or rider sends a support message through the Uber App, or calls Uber with a concern or complaint, Uber responds using automated software programming and, where necessary, deploying a global customer support staff that follows Uber's protocols to address the concern or complaint.

Uber facilitates, controls, tracks, and records these interactions via its internal customer service software.

95. Neither drivers nor riders have access to the information in Uber's internal customer service relations platform. Uber has the ability to track and investigate driver and rider misconduct that occurs when drivers and riders use Uber's transportation services, and over time it has increased its actual tracking of driver misconduct.

96. A rider has no knowledge of an Uber driver's prior bad actions, including whether the Uber driver had prior complaints, is or was under investigation for misconduct, or had been subject to any suspension or other disciplinary action. A rider further has no control over which Uber driver they will be paired with on any ride. Uber alone controls the pairing and controls access to all information between the rider and the driver.

**ii. Uber controls its drivers and their work**

97. Uber exercises extensive control and direction over its drivers in connection with the performance of the work that Uber hires the drivers to perform.

98. Uber is a transportation company that provides transportation as its core business. Uber drivers' work is thus squarely within and integral to the usual course of Uber's business, as Uber cannot provide transportation services without drivers.

99. Driving for Uber is not a specialized skill. Uber drivers are largely nonprofessional, untrained individuals, who have no specialized background, education, training, or experience related to their work for Uber. Uber drivers are not customarily engaged in an independently established trade, occupation, or business.

100. No preparation or up-front investment is required to work for Uber. Any person with a vehicle and driver's license can decide to drive for Uber, and apply to do so within the very same hour.

101. Uber's investments into its transportation company greatly outweigh the investments by the Uber driver. Uber has invested hundreds of millions of dollars into its transportation network and transportation systems. Additionally, Uber maintains brick and mortar facilities around the world where it employs thousands of individuals to interact with Uber drivers and riders.

102. No specialized tools or equipment are required to drive for Uber. Rather, Uber drivers need only have a personal vehicle that is subject to approval by Uber. For example, Uber currently requires, among other things, that Uber vehicles have four doors, be in good condition with no cosmetic damage, and be free of any commercial branding.

103. Uber provides its approved Uber drivers with access to Uber-branded decals and signage for use in their vehicles while they maintain active Uber accounts.

104. Uber requires drivers to comply with a list of "Community Guidelines" that Uber promulgates. The term is itself misleading because it makes it sound like driving for Uber is like visiting a fitness center or the library. In reality, Uber drivers operate in an environment and under such restrictions (or lack thereof) as Uber unilaterally decides. Violation of any of the "Guidelines" is grounds for termination.

105. Uber drivers must use the Uber App to access, accept, and complete Uber rides.

106. Uber sets the minimum amount of work that an Uber driver must complete. For example, Uber requires that an Uber driver complete at least one trip each month; otherwise, Uber will deactivate their account.

107. Uber monitors how long an Uber driver has been driving and disables the driver's App for six hours after driving time reaches 12 hours.

108. Uber retains the ability to deactivate a driver's App without notice or investigation.

109. Uber has exclusive access to the customer list (riders), customer locations, and the customer's destination requests.

110. Uber designates the approved geographical region for the Uber driver. If the Uber driver wants to receive rides outside of that area, they must submit a request to Uber.

111. When Uber offers a trip to an Uber driver, its practice has been to withhold information from Uber drivers such as the rider's destination address, gross fares, net fares to the driver, per mile rate, and per minute rate. By withholding this information, Uber requires Uber drivers to blindly accept the trip without knowing the final destination or the amount that the driver will earn.

112. Uber assigns all drivers' work through its driver/rider matching algorithm. The Uber driver cannot choose which rider to be matched with, nor can riders choose their drivers.

113. Uber has exclusive control of the customer volume. Uber decides who, when, where, and how many ride requests to assign to each driver.

114. The Uber driver has zero control over the value of the services provided. Uber unilaterally sets the base fare, time fare, distance fare, wait-time fare, and all surge fares (algorithmic increases in fares to reflect supply of drivers and demand of riders).

115. Uber dictates what forms of payment are accepted and forbids Uber drivers from requesting or accepting cash for fares. Uber forbids drivers from negotiating a different fare with riders for any trip on its system.

116. Uber tracks Uber driver locations and suggests certain routes for trips. Uber has the right to adjust a fare if a driver takes a different route.

117. Uber alone decides what percentage of each fare to keep and what percentage to pay to the driver or, in some cases, whether to share certain fares with the driver at all. Uber does not inform drivers how much the rider is paying.

118. Uber processes all payments and distribution of payments to the driver.

119. To begin work, a driver logs into the Uber App and then waits for Uber to select a customer. Uber refers to this time that a driver is activated but un-dispatched as "Period 1" time (or "P1").

120. Uber uses real-time GPS monitoring to track the driver at all times while logged into the app, beginning with P1 time.

121. During P1, Uber unilaterally decides when and where to send the driver trip assignments for customers requesting rides.

122. Once Uber gives a driver a trip assignment, Uber allows the driver only 15 seconds during which to "accept" the assignment. However, the appearance of a "decision" by the Uber driver as to whether to "accept" a ride is only superficial. Uber controls the information provided to the Uber driver during the 15 seconds, and it generally does not provide the driver the estimated fare, estimated distance, rider's pickup location, or final destination (despite possessing all of the information) to allow the driver to make an economic assessment.

123. Uber monitors the driver's use of the Uber App, and the rate of accepted, declined and cancelled assignments, which Uber can use to deactivate or suspend the driver.

124. Once a driver accepts a trip assignment, the driver enters what Uber refers to as "Period 2" time ("P2"). This is the period in which the driver is dispatched but has not picked up the rider.

125. During P2, Uber provides a driver with the rider's pickup location, but it still does not provide the driver with the estimated fare, trip time, distance, or destination.

126. Upon arriving at a rider's location, the driver remains in P2 until the rider physically enters the vehicle. Once the rider enters, the driver must inform the Uber App to begin the trip. The time during which the driver is transporting the rider to her destination is referred to as "Period 3" ("P3").

127. During P3, Uber uses its technology to monitor the driver's speed and location; whether the driver is arriving within Uber's estimated time of arrival; whether the driver is taking the rider "off route;" and whether the driver is operating his vehicle in a way Uber deems acceptable. Uber can, and at least sometimes does, monitor audio within a vehicle, but does not make the audio recording available to drivers or riders, and instead uses the audio when doing so would protect Uber's interests.

128. Additionally, Uber uses its technology and GPS data to monitor the speed, braking, and other driving maneuvers. Uber's system monitors this data for every trip.

129. Uber advertises that, during P3, it offers a service called RideCheck. In Uber's words, "Using sensors and GPS data, this feature can help detect if a trip doesn't go as planned. We'll check in to make sure the driver and rider are safe and provide easy access to emergency assistance features for immediate help if needed."

130. Uber advertises: "If an incident occurs, in-app support is available around the clock. Our specialized team of safety agents are trained to handle sensitive reports and can offer support resources."

131. If an Uber driver deviates from Uber's suggested route, Uber notifies the driver that they are not following the suggested route.

132. Uber controls the driver's actions by threatening to deactivate or suspend drivers if they do not maintain a certain star rating. Uber unilaterally sets the star rating and constantly prompts Uber drivers to keep a high star rating or to improve the star rating if the driver is not performing to Uber's standards.

133. Uber unilaterally sets the percentage of trips a driver can cancel. A "cancelation" occurs if the driver accepts the trip and then cancels the trip before the rider enters the vehicle. Despite the driver not having key information prior to accepting the trip Uber offers, Uber can deactivate a driver if the driver cancels too many trips.

134. If a driver engages in misconduct or alleged misconduct that Uber considers to be a "strike," Uber can and will issue a "strike." In Uber's discretion, a certain number of strikes can result in the driver being permanently removed from the Uber App. However, Uber does not inform drivers or riders whether a driver was previously issued a strike.

135. In addition, Uber engages in personnel management typical of an employer-employee relationship, including: facilitating "meaningful dialogue" with drivers; "hold[ing] regular meetings with Driver associations and conduct[ing] regular surveys to gather feedback on our app, our support services, and other matters"; "continually developing new technology that Drivers can use to acquire information that may help them save on costs and make informed choices about where and when to drive (based on when and where their earnings potential is highest)[;]" and "partner[ing] with learning and academic institutions to provide opportunities to eligible Drivers and their family members through undergraduate degree programs and courses on entrepreneurship, skills development and language learning."

**iii. An elevated risk of sexual assault was always a foreseeable consequence of Uber's transportation model, and Uber always had a duty to address and prevent this harm**

136. Reasonably careful and responsible businesses adopt a "think before you act" way of doing business. They do not just think about how to make money, but also about the effects their actions will have on others, including on public safety. They think about whether their business will put people at risk, including the risk of crime, and they think about how to reduce any such risk.

137. Transportation companies have a particular duty to keep passengers safe. By offering transportation services, such companies assert that they can be trusted to safely transport someone from one place to another. Riders who get in a plane, train, taxi, or Uber, are trusting that the transportation company will keep them safe.

138. More so than other businesses, transportation companies have to think about and address the ways that passengers could be harmed, including the risk of crime in connection with the pick-up, transport, or drop-off process.

139. The more innovative a business, the more important it is for the business to think about the potential that it might introduce new but foreseeable risks to public safety.

140. Uber is an extraordinarily innovative transportation company. Its business model disrupted and transformed the entire transportation industry.

141. When Uber introduced so-called "peer-to-peer" transportation in 2013, this innovation foreseeably brought an elevated risk of sexual assault. Uber's transportation model involved aggressively recruiting large numbers of random people who just happened to have a driver's license and a car, learning little about them, and requiring of them virtually no up-front investment. The drivers had almost nothing to lose in comparison with professional drivers. Uber then convinced riders to trust that Uber's business model was safe, that

the dangers were thoroughly vetted, and that riders could securely entrust their safety with Uber drivers, who, in turn, would have the power to control the riders' freedom of movement. Once in Uber drivers' cars, the riders were isolated from potential witnesses, aid, and escape.

142. A driver's license is not even a minimal guarantee of a safe driver. Almost anyone can get and maintain a driver's license. Loss of a license is not a typical consequence of committing a crime, including sexual assault, domestic violence, or violent behavior. No one has to undergo any type of background check to get a driver's license.

143. The foreseeable use environments for Uber's transportation system include: drunk riders, to whom Uber specifically advertises its service; inexperienced riders (by definition all new riders—there is no Uber passenger training); riders who fall asleep during a trip; drivers who sign up for Uber thinking that it is an opportunity to meet sexual partners or engage in sexual activity; drivers who sign up for Uber not understanding riders' expectations that professional drivers will respect their boundaries and keep them safe even if they are intoxicated, distracted, friendly, flirtatious, or sleepy.

144. In 2013, when Uber opened its business to non-professional drivers, it was well known that situational and environmental factors contributed to sexual violence, and that sexual predators take advantage of situational vulnerability to perpetrate sexual violence.

145. An elevated risk of sexual assault was always a foreseeable consequence of Uber's business model, and Uber knew or should have known this.

146. Indeed, Uber's model gave predatory drivers incentives (rather than deterrents) to drive in the area of late-night venues and clubs—habits that Uber easily could have tracked. The drive-when-you-want approach provided an

ideal opportunity for bad actors to sign onto the App late at night. Uber easily could have, but failed to, address this issue using its algorithms.

147. Reasonably careful and responsible businesses, when they innovate in ways that foreseeably introduce new or heightened public safety risks, think about and address those risks in an evidence-based way, including by hiring the right experts, and devoting adequate money and other resources to study those risks and prevent harm. Uber took none of these measures.

**iv. From the outset, Uber did not address or prevent sexual assault.**

148. From its founding, Uber's culture had little regard for legal compliance or responsibility.

149. This attitude informed how Uber approached sexual assault. Uber did not think about, talk about, or study the risk of sexual assault on its platform. It did not conduct studies, focus groups, or user testing for the purpose of preventing sexual assault.

150. Uber did not devote money or resources to preventing sexual assault on its platform.

151. Uber did not assign accountability to any employee for the issues of safety, identifying or addressing potential risks to Uber's riders, or preventing sexual assault. Uber asserted that safety was everybody's job as a way of disguising that it was nobody's job. Uber did not hire safety engineers, certified safety professionals, or any other personnel with expertise in safety, crime prevention, or sexual assault prevention.

152. Uber did not build the Uber App, nor design its transportation system, nor adopt measures or policies, in a way aimed at preventing sexual assault.

153. In 2017 and 2018, when Uber finally began appointing employees to positions ostensibly focused on sexual violence prevention, it did not require expertise or background in safety fields. Personnel at Uber whose job titles

involved safety were tasked with protecting Uber's reputation rather than ensuring the safety of its riders.

154. Uber could have dramatically and effectively reduced—if not eliminated—sexual assault on its platform if it had designed its transportation system with that goal in mind. When companies that operate daycare centers, schools, and business offices engage in evidence-based research on situational sexual violence prevention, they are usually able to dramatically and successfully reduce or eliminate these crimes.

155. Uber had many tools at its disposal for reducing riders' vulnerability to sexual assault, including but not limited to: rigorous screening of drivers; prompt termination of drivers who engage in sexual misconduct; in-App tools such as panic buttons with prompt responses from Uber and coordination with law enforcement; surveillance for unusual conduct (such as lengthy stops) during rides; training drivers and communicating to them that there will be strict penalties and accountability; diligently investigating allegations of sexual assault; communicating to riders that because Uber's drivers are not professionals and are not well known to Uber, Uber is unsafe and unsuitable for use by solo intoxicated riders; immediate termination of drivers who violate policies, mandatory installation of cameras that could not be deactivated during trips, and so forth.

156. Uber, as a technologically advanced company that tracks drivers for its own benefit, had the ability to require drivers to use inward-facing cameras that would record whenever a passenger was in the vehicle. Uber had the ability to design these cameras to remain operational until both the driver and rider confirmed that the trip was over. Uber knew that requiring such cameras would be a powerful deterrent to sexual assault. However, Uber had no interest in requiring drivers to have cameras or other physical equipment that might slow its rapid onboarding of new drivers or discourage some drivers from applying.

It also worried that requiring cameras might be construed as evidence of "control" that would establish an employer-employee relationship between Uber and its drivers. Therefore, it did not require cameras.

157. More generally, Uber had no interest in slowing its growth in order to study safety. Consequently, it did not take sufficient action to study or prevent sexual assault. The safety- related studies the company did conduct were ignored, asked the wrong questions, or were designed in a way to lead to pre-determined conclusions (such as cameras not preventing sexual assault).

158. It is well established that sexual assault is preventable through environmental modifications that deter sexual violence. If Uber had been reasonably thoughtful and careful in the rollout of its transportation product, it could have prevented the sexual misconduct that harmed Plaintiffs.

**v. Uber chose to increase the risk of sexual assault by making it too easy to become a driver.**

159. The key to Uber's competitiveness and profitability was and is to have as many drivers on the road as possible.

160. Starting in about 2013, Uber was threatened by competition from start-up companies, including Lyft, which at the time was a smaller start-up company that had started offering "peer-to-peer" rides locally in San Francisco just before Uber did so, and Sidecar, another small start-up that sought to compete against Uber and Lyft.

161. In 2013, when Uber started monetizing rides with non-professional drivers, it had an initial advantage over Lyft and other startups as a better established company with an international presence. However, Uber did not control any unique resources or trade secrets that would allow it to easily maintain this initial advantage. Uber was aware that it was vulnerable to being overtaken by competitors if it did not outpace their growth.

162. Uber understood that the company with the most drivers would be able to offer cheaper prices and shorter wait times, thereby attracting more riders, fueling demand for yet more drivers, and facilitating an upward spiral of growth and continued market control.

163. Uber understood that if it wanted to achieve and maintain market dominance, it would need to eliminate barriers to entry that would slow expansion of, or limit the size of, its fleet of drivers.

164. At the same time, Uber understood that the background checks, interviews, in-person interactions, checking of references, drug and alcohol testing, training, tests, and other barriers to becoming a licensed taxi driver traditionally existed to protect passengers from unscrupulous, unqualified, and dangerous drivers, including those who would use their position of trust to commit sexual assaults.

165. To create a large and ready supply of drivers, Uber decided not to implement reasonable or traditional measures to protect passengers from dangerous drivers. It committed to beat its competitors in a "race to the bottom," where the winning company would be the one that broke the most rules and eliminated the most barriers to driver onboarding. This decision foreseeably came at the expense of the safety of Uber passengers, especially female riders.

**vi. In order to create a large and ready supply of drivers, Uber opened its platform to unscrupulous, unqualified, and dangerous drivers.**

166. In 2013, when Uber opened up its platform to non-professional drivers, its then largest shareholder and CEO Travis Kalanick made the decision that Uber would not fingerprint drivers or run applicants against gold-standard databases, such as FBI records.

167. Instead, he made the decision to use a fast and shallow name-based background check with a short look-back period, and spotty coverage of potentially relevant jurisdictions, records, and crimes.

168. Name-based background checks of the sort Uber uses present systematic, fundamental problems. First, there is no way to positively identify a person via a biometric indicator, increasing the likelihood of fraud. Second, because names, addresses and birthdays are not unique, the likelihood of false positives (a person linked in error with another's record) and false negatives (someone getting cleared when they should not) is greatly increased. For example, if an individual changes his name, or for some other reason has a criminal history under a different name, the name-based checks can miss the individual's criminal history.

169. Uber hired Hirease, Inc. to do its background checks. Hirease bragged that it could vet drivers within 36 hours.19 At times, Uber enrolled drivers before the cursory and ineffective background check was even complete.

170. Uber "had so lowered the bar to become a driver that people who might have been prevented from driving in the official taxi industry could easily join Uber."

171. Mr. Kalanick made the decision not to interview drivers, talk to drivers, meet drivers, require any prior experience, get any references, do any other screening beyond the cursory background check, conduct any trainings of any sort, do any drug or alcohol testing, require any tests or exams, or require any up-front investment of time or money on the part of applicants to drive.

172. Uber aggressively marketed to potential drivers that it was easy to become an Uber driver, with emails offering sign-up bonuses and promising that applicants could be approved after only 20 minutes.

173. Mr. Kalanick also made the decision to do a background check only once, and not to monitor drivers' safety records for the purpose of learning of new disqualifying criminal offenses.

174. Ever since 2013, Uber has been aware that its security screening processes are insufficient to prevent unsafe applicants from successfully registering as Uber drivers. Its inadequate background checks have been the subject of a number of municipal lawsuits and fines.

175. In 2014, the District Attorneys of San Francisco and Los Angeles filed a complaint alleging that individuals who passed Uber's security screening process and were found driving for Uber had the following felony convictions: second degree murder; lewd and lascivious acts against a child under the age of 14; sexual exploitation of children; kidnapping for ransom with a firearm; assault with a firearm; grand theft; robbery; identity theft; burglary; and taking a vehicle without consent. In connection with the litigation, the San Francisco District Attorney called background checks without fingerprinting "completely worthless."

176. When cities and states (such as Houston and Maryland) performed their own fingerprint-based background checks, numerous driver applicants who had already been approved by Uber were ultimately rejected by the governmental screenings. For example, in Maryland, nearly 15 percent of new drivers who were eligible under Uber's standards were disqualified for failing the state's background checks.

177. In 2017, when Massachusetts began running its own background checks on Uber and Lyft drivers, the state rejected 20,000 out of 170,000 driver applications that had been approved by the companies. Of those, 3,471 were rejected due to violent crimes.

178. In 2017, the Colorado Public Utilities Commission fined Uber $8.9 million after "state criminal investigators found it had allowed 57 individuals

with past criminal or motor vehicle offenses to drive and pick up passengers on its platform" for the prior year and a half.

179. In August 2017, Mr. Kalanick was forced out of the company under a wave of scandal, and was replaced by Uber's current CEO, Dara Khosrowshahi. While Mr. Khosrowshahi represented a fresh face for the company, he did not—and could not, consistent with his charge to grow the company as fast as possible—institute fundamental change in how the company thought about and protected its passengers' safety.

180. For example, Mr. Khosrowshahi continued the policy of hiring drivers without biometric fingerprinting that could be run through the FBI database. This decision was deliberate, as evidenced by Uber's active lobbying against municipal or regulatory proposals to require any kind of biometric fingerprinting for drivers.

181. Uber's need to quickly and easily onboard large numbers of new drivers did not abate over time in part because of a high rate of turnover among Uber. Its drivers are not well paid and often move on to other jobs.

182. Furthermore, Uber's competitors, primarily Lyft, had imitated Uber in eliminating barriers to entry. The rapid onboarding process Uber first introduced thus became a competitive necessity.

183. To this day, in Uber's words: "Most people can drive with Uber, even if you don't have a car or commercial permit." The minimum requirements to become a driver vary slightly by city, but are typically now: "Meet the minimum age requirement; be legally allowed to drive in your country; watch a short training video."

184. To this day, Uber still performs almost no meaningful screening of its drivers. It still outsources background checks of driver applicants to third party vendors who do not perform stringent background checks. There is no verification that social security numbers and other personal identification

numbers submitted through the application process do, in fact, belong to the applicants.

185. In fact, Uber acknowledges that its current processes are flawed: "[T]hese qualification processes and background checks may not expose all potentially relevant information" and "our third-party service providers may fail to conduct such background checks adequately or disclose information that could be relevant to a determination of eligibility."

186. Uber remains willing to accept the consequences of its failings, candidly noting that, as a consequence of the gaps in background checks, "we expect to continue to receive complaints from riders and other consumers, as well as actual or threatened legal action against us related to Driver conduct."

187. Uber readily admits that its willingness to accept this consequence is because the trade-off is business profitability: "Changes in Driver qualification and background-check requirements may increase our costs and reduce our ability to onboard additional Drivers to our platform." Indeed, Uber expressed concerns that legislative and regulatory changes to driver requirements—which may be prompted by increased awareness of sexual assaults by Uber drivers—could reduce the number of Uber drivers on the market or extend the time required to recruit drivers: this "would adversely impact our business and growth." Thus, because more stringent background checks would negatively impact Uber's bottom line, Uber made the choice to sacrifice passenger safety in order to maximize profit.

188. Uber still does not require fingerprinting for comparison against Department of Justice and Federal Bureau of Investigation databases.

189. Uber has its vendors simply run potential drivers' social security numbers through public databases similar to those held by private credit agencies. These public databases are often incomplete and do not capture all arrests or convictions. The availability and quality of data varies depending on

the jurisdiction, and some drivers have spent years living in jurisdictions, including foreign jurisdictions, from which criminal histories are very limited or unavailable via public databases. Uber also places unreasonable limits on how far its vendors look back at criminal history, and what types of crimes are disqualifying.

190. To this day, neither Uber nor its third-party vendors verify that the information provided by applicants is accurate or complete.

191. To this day, Uber does not require any references or gather information from prior employers.

192. To this day, Uber does not interview its drivers either in person or through online platforms such as Skype or Zoom.

193. To this day, there is little to no up-front investment required of Uber drivers. In fact, it is no longer a requirement that a driver even have a vehicle. Uber partners with car rental companies to make rental cars available to prospective drivers. It advertises: "Drive with Uber without owning a car. Don't have your own car? You can choose one that comes with insurance, unlimited mileage, basic maintenance, and/or other possible options" and "You can pick a car from our vehicle partners with low or no upfront costs and no long-term contracts, so you can return it when you're ready."

**vii. In order to create a large and ready supply of drivers, Uber broke the law, then wrote its own rules.**

194. In order to create a large and ready supply of drivers, Uber leapfrogged over safety regulations and laws that governed the transportation industry.

195. Rather than work with regulators to develop heightened protections to address the inherently increased risk posed by its transportation model, Uber did the opposite. It deliberately flouted existing safety regulations and laws that applied to taxi companies and other motor carriers.

196. In at least one market, Uber trained its drivers how to avoid law enforcement and promised to reimburse drivers for any tickets they received.30

197. Uber employed its unmatched technological skills to break the law.

198. One of the company's most effective tools was a software program called "Greyball." Greyball identified Uber App users that posed a threat to Uber's business, including law enforcement officers, transportation officials, and legislative opponents.

199. If a user was "Greyballed," their App might show a map of nonexistent "ghost cars," or falsely reflect no available cars at all. Either way, real Uber drivers would never accept a Greyballed user's ride request.

200. In order to identify law enforcement, Uber used "geofencing" to draw a digital perimeter around police stations and flag users in that area who were quickly opening and closing the Uber App (likely to monitor nearby drivers). Uber would then review the personal information on those users' accounts for other indicators. If the data suggested the user was police or parking enforcement, their account would be "Greyballed."

201. Internally, Uber justified the Greyball program by reasoning that authorities hailing rides solely to impound cars and fine drivers were violating Uber's terms of service. Uber employees around the globe were trained on how to use the program to break through in difficult markets.

202. Uber developed Greyball in 2014 in response to an especially difficult battle to enter the market in Philadelphia, Pennsylvania. The program was successfully used for nearly three years, until news broke in March 2017 that Uber had an internal program specifically designed to evade local authorities. Numerous local, state, and federal investigations followed.

203. Uber got away with breaking the law, and then rewriting its own laws, by using the following formula. It ignored existing laws and regulations, enabling itself to quickly onboard many drivers. This allowed it to offer a

service that was immediately cheaper and more convenient than existing options, and therefore popular. It then harnessed this popularity, mobilizing the public to oppose enforcement of existing laws against Uber, and to support new legal standards that Uber wrote. 31 This formula allowed Uber to escape penalties for violating existing laws, and successfully resulted in low cost, convenient transportation for the public, and in huge growth for Uber. But these benefits to Uber and the public came at a high price for a group of riders, primarily women, who were sexually assaulted because of the lack of safety standards and regulations.

204. Per one researcher: "When local law enforcement and other officials respond [to Uber's illegal operations], the company mobilizes a campaign to 'save Uber.' …. Uber usually wins these battles against rules and regulations the company opposes, but when it loses, it keeps fighting. When cities pass laws that Uber opposes, the company commonly seeks to have them preempted with Uber-approved state law or repealed through voter referenda."

205. In the words of two journalists, "Uber's ascent to the largest rideshare company in the world was fueled by a recurring cycle in which it blatantly ignored state and local laws became entrenched and widely used in a community and then tried to use its largesse to change the laws it was breaking."

206. Uber's philosophy was that the popularity of its product gave it effective immunity against legal regulations and consequences. Its corporate policy was: "seek forgiveness rather than permission."

207. Through these aggressive tactics, Uber succeeded in getting some state legislatures and regulatory agencies to pass laws or regulations stating that Uber does not manage, control, or direct its drivers; that its drivers are not employees for wage and hour purposes and need not receive employee

benefits; that Uber is not a common carrier for rate-setting and regulatory purposes; or that Uber is a mere technology company.

208. Using traditional lobbying efforts as well as its own social media clout, Uber lobbied (and continues to lobby) state and local governments, including in California, to adopt its own proposed "model" regulations, which allow it to conduct its own background checks, instead of more stringent regulations like those used for taxi drivers.

209. In Austin, Texas, where regulators imposed fingerprint background checks, Uber retaliated by pulling out of the city altogether. Uber returned to the city only after successfully lobbying the state legislature to preempt Austin's rules.35 When Uber returned, competing companies that had abided by Austin's rules were driven out of business.

**210.** As a direct result of Uber's lobbying efforts and social media campaigns, Uber largely self-enforces standards for hiring, training, and supervising of its drivers.

**viii. Uber deceptively convinced the public and Plaintiffs to trust Uber to offer safe rides**

211. In order to disrupt the public's cautious attitude on the topic of getting into a private car driven by a random unknown person, Uber spent many millions of dollars marketing and promoting the concept that its UberX drivers, driving unregulated, non-distinctive personal cars, could be summoned with the "Uber App" and trusted to transport people safely.

212. Uber saturated the public with safety marketing directed to every single Uber customer as well as the general public. Uber promoted its safety message through advertising in bars, stores, and other business establishments and public places, and as well as placing ads online in search engines, social media, and direct email and app-based communications to Uber customers.

213. Safety remains today part of the essential value proposition of the Uber product. This is so because of Uber's representations. It is also the case because of the inherent nature of the product. To some extent, all providers of public transportation are implicitly agreeing to provide safe transit to passengers. To an even greater extent, because Uber requires people to voluntarily enter into an enclosed environment controlled by a random stranger, Uber's passengers are relying on Uber's express and implied promise to provide a safe ride, and Uber's reputation for safety.

214. As a result, every rider can be presumed to have relied on Uber's representations of safety and its concealment of a lack of safety for those using its transportation system.

215. When Uber sends a driver to a rider, and the driver shows up at the specified time and place in a vehicle bearing an Uber decal or otherwise matching the expectations Uber established, Uber intends the Uber decal and other matching features to reassure the prospective passenger: "This is not just a random stranger's car. It is an UberX and it is safe to get in."

216. Uber owns several trademark registrations for "UBER" and several Uber-based marks. It has used Uber as a trademark and trade name in connection with goods and services since 2010. In opposing applications submitted by others to the United States Patent and Trademark Office that contain some form of the word "Uber", Uber has stated that through its "marketing, promotion, advertising, and commercial activity, the public readily associates the UBER Marks and Names with Uber and its goods and services. The UBER Marks and Names are thus valuable assets of Uber and symbols of its goodwill." Uber has argued that "Even more, the fame and reputation of Uber is of such a nature that a connection with Uber would be presumed when [an unaffiliated person or company] uses [a trademark containing the word uber] in connection with its services." Uber has further

argued that “[a trademark containing the word [‘uber’] uniquely and unmistakably points to Uber’s famous name and identity.” Trademarks and service marks are recognized to function both as an indication of origin or ownership and to serve as a guarantee of constancy of the quality or other characteristics of a product or service.

217. Uber knows that its riders recognize, are familiar with, and trust its famous transportation brand, and that they do not recognize, know, or automatically trust Uber drivers. To induce riders to get into these drivers’ vehicles, Uber knows that it must cultivate a reputation for safety and transfer that reputation to Uber drivers.

218. Because of Uber’s representations, Uber’s riders believe that Uber drivers are working for Uber, that Uber has vetted them and is certifying that they are safe drivers who will provide safe transportation. Uber advertises and markets its brand and safety record in a manner designed to cause the public to believe these things. And it knows that the public believes these things and relies on these beliefs.

219. By initially using the term “UberX” to refer to rides provided by licensed professional drivers in unmarked cars and then using it to refer to rides provided by random nonprofessional drivers in unmarked cars, Uber deceived its riders. It did not tell its riders that UberX drivers were random drivers who happened to have a driver’s license and access to a vehicle. In 2013 and 2014 it described UberX simply as “the low-cost Uber.”

220. Uber has never presented itself to the public as a mere technology company or broker of transportation services. It has always advertised itself as a transportation company that provides reliable and safe rides. For example, in 2011-2013, its website and ubiquitous advertising called Uber “Everyone’s Private Driver.” It also advertised the fact that it was dispatching “licensed, professional drivers.” In 2015, its website said Uber provided rides on demand

and in 2016 it said, "Uber is the smartest way to get around." In 2017 and 2018, its website said, "Wherever you're headed, count on Uber for a ride" and "Ride with Uber."

221. At all times, Uber has communicated with drivers using language such as "Sign up to drive" as opposed to "sign up to offer your driving services via our app."

222. At all times, Uber has communicated with riders using language such as "Sign up to ride" as opposed to "sign up to connect with rides, which may or may not be safe, offered by random drivers whom we don't know and can't vouch for other than to say they passed our cursory background check."

223. To this day, Uber's listing in the Apple app store advertises that the public can "ride with Uber." It does not say "You can request a ride with a person we've never met, for whom we've conducted only a quick and superficial background check."

224. Uber held out its transportation as available to any member of the public. For years, it advertised: "Open to everyone, everywhere. All ride requests are blindly matched with the closest available driver. So there is no discrimination based on race, gender, or destination."

225. Uber built its brand and business by aggressively marketing safety. For example, Uber Boston General Manager Michael Pao was quoted in the Boston Globe on March 13, 2013, as saying: "We proudly give thousands of riders a safe, reliable ride…"

226. In June 2014, Uber's Head of Communications, Lane Kasselman, told NBC Bay Area: "We're confident that every ride on the Uber platform is safer than a taxi."

227. In 2014, Uber started charging passengers an extra $1 fee for each trip. Uber called this a "Safe Rides Fee." When Uber announced the "Safe Rides Fee," it told the public that the "[f]ee supports our continued efforts to ensure

the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."

228. Uber collected the "Safe Rides Fee" on hundreds of millions of rides and made hundreds of millions in revenue as a result." But it never earmarked the money for improving safety or for the safety-related items it promised. The actual purpose of the "Safe Rides Fee" was to "add $1 of pure margin to each trip." As one former Uber employee said, "[w]e boosted our margins saying our rides were safer. … It "was obscene."

229. Uber has actively marketed and successfully cultivated an image among its customers of safety and superiority to public transportation and traditional taxis – which is reflected in its very name.

230. Over the years, Uber's marketing has consistently promoted the theme of safety. In its early years, Uber advertised the "safest rides on the road" and designed ads showing children using its service. For example, Uber's Safety page displayed this ad:




231. Until 2016, Uber continued advertising its rides as being the safest rides on the road, presented its standard as the strictest possible, and presented its

background checks as "gold standard" and "industry leading." For example, it said: "Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest standards possible, and then working hard to improve them every day. The specifics vary depending what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – what we are doing in the US is an example of our standards around the world." In 2016, it also advertised: "From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind."

232. Uber knew this marketing was false. In 2016, Uber agreed to pay $28.5 million to settle a class action lawsuit over its fraudulent marketing of its security screening as "industry leading." In 2016, Uber also agreed to pay $25 million to settle a consumer protection action filed by the County of Los Angeles and City of San Francisco, and it agreed as part of the settlement to stop using phrases such as "safest ride on the road" and describing its background checks as "gold standard."

233. When Uber announced the 2016 settlements, it did not correct its misstatements or tell the truth about its standards, background checks, or safety record. Instead, it explained its advertising changes as follows: "[N]o means of transportation can ever be 100 percent safe. Accidents and incidents do happen. That's why we need to ensure that the language used to describe safety at Uber is clear and precise."

234. Uber's fraudulent safety advertising caused it to gain a large customer base. Even after the 2016 settlements, Uber kept the benefit of its fraud. Uber kept pointing to its fraudulently-gained large customer base as evidence of its purported trustworthiness, and as a reason for more customers to trust it.

235. In 2017, following its fraud settlements, Uber subtly changed its advertising to be slightly more vague, but still misleading. It advertised: "From start to finish, a ride you can trust" and "[S]afe rides for everyone: Whether riding in the backseat or driving up front, every part of the Uber experience is designed around your safety and security." It also described "How we keep you safe" and proclaimed, "Trip Safety, Our Commitment to Riders." It further proclaimed: "Uber is dedicated to keeping people safe on the road."

236. In 2018, Uber continued advertising: "Safety, Our commitment to riders and drivers. Uber is dedicated to keeping riders and drivers safe on the road."

237. In 2019, Uber continued advertising, "Your safety is always a top priority. We're committed to helping drivers and riders get where they want to go with confidence." It also advertised that it was "Building safer journeys for everyone." Uber CEO Dara Khosrowshahi said, "Helping keep people safe is a huge responsibility and one we do not take lightly."

238. In 2020, Uber advertised "Our new Door-to-Door Safety Standard. We want you to feel safe riding with Uber."

239. From 2020 to the present, Uber has advertised (with minor variations): "Before anyone can drive with Uber, they must undergo a multi-step safety screen, including being checked for driving violations, impaired driving, violent crime, and other checks. In addition, Uber rescreens drivers every year and uses technology to look for issues in between." Uber described these background checks as "part of our commitment to help keep you safe when you request a ride with Uber."

240. Uber has never explained to riders the many limitations of its background checks. Instead, it has falsely represented that the background checks are comprehensive, and made it sound as though anyone with any criminal history would be precluded from driving for Uber. For example, Uber

previously advertised: “Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards,” which “includes a three-step criminal background screening for the U.S.—with country, federal and multi-state checks that go back as far as the law allows—and ongoing reviews of drivers' motor vehicle records throughout their time on Uber.”

241. From 2021 through the present, Uber has continued prominently advertising “Our commitment to your safety,” and told the public it was “Focused on safety, wherever you go.” It also said “we’re committed to helping to create a safe environment for our users.”

242. To this day, Uber’s website advertises: “Ride with confidence—The Uber experience was built with safety in mind. Through incident prevention tools, insurance coverage, and technology that keeps you connected, we’re dedicated to helping you move safely and focus on what matters most.”

243. To this day, Uber’s website describes how Uber is “Designing a safer ride” and that it offers “features to help keep you safe.”

244. To this day, Uber advertises on its “ride with confidence” page that “Drivers must clear several screenings.” It also says: “Before anyone can drive with Uber in the US, they must complete a background check. Current drivers continue to be vetted every year.”

245. To this day, Uber advertises on its “ride with confidence” page: “Designing a safer ride—An inclusive community—Through our joint efforts with cities and safety experts and by working together, we’re helping to create safe journeys for everyone.” Uber further states: “Before anyone can drive with Uber, they must undergo a multi-step safety screen. We regularly review their history for issues like impaired driving and violent crime.”

246. To this day, Uber falsely maintains that safety is its top priority.

247. Because of Uber's aggressive marketing, most Uber customers are generally unaware of the real risks associated with Uber rides and continue to think of Uber as a wellknown, widely trusted transportation company that rigorously vets drivers and stands behind the safety of the rides it offers. Most Uber customers are not aware of all the limitations of Uber's screening process, background checks, safety measures, and oversight of drivers. Nor are they aware that Uber refuses to take any responsibility for driver misconduct.

**ix. Because women are more vulnerable to gender-based violence, and thus require more persuasion to feel safe enough to get in a stranger's private car, Uber specifically targets its safety representations to women.**

248. Since its inception, Uber has disproportionately featured smiling women riders in its advertisements. These ads were intended to and did create the impression that its transportation system is designed for and safe for women.

249. Uber also promulgated video campaigns specifically aimed at reassuring women its platform is designed for them and safe for them. For example, in 2015, it ran an ad campaign called "Driven Women" featuring "the stories of the women who ride and drive with Uber in the Pacific Northwest region of the United States."

250. Until recently, Uber had an entire webpage devoted to "Driving women's safety forward." The page describes "safety features built into every ride." It advertises, "We're dedicated to building a platform where women feel safe." Until recently this page also advertised, "Uber is committed to help stop incidents before they happen."

251. Through such representations, Uber successfully induces women to trust Uber as a safe transportation provider and, on that basis, to get into private vehicles with Uber drivers.

**x. Even though Uber knows intoxicated Uber riders have the highest risk of being the targets of sexual misconduct, it specifically advertises its transportation as safe for intoxicated riders, including intoxicated women.**

252. Environment is a major risk factor for sexual assault. When potential witnesses are nearby or when a potential victim is someone likely to be believed, even unscrupulous people otherwise willing to engage in sexual misconduct are often deterred by the potential for unwanted consequences. The converse is true: when a potential victim is isolated away from potential witnesses and when intoxication would undermine the potential victim's ability to persuasively testify against a perpetrator, the risk of sexual violence is particularly high. Researchers call this "situational vulnerability." Situational vulnerability was well known to sexual violence experts, businesses, and the general public by 2013.

253. By 2013, when Uber started a new transportation system, it either understood or should have understood the concept of situational vulnerability. It knew or should have known that its new transportation system gave rise to a heightened risk of sexual assault, and that this situational vulnerability would be at its highest for intoxicated women taking Uber rides alone.

254. Since 2013, Uber observed that a big segment of its potential market consisted of intoxicated individuals and that it could increase its profitability by targeting these potential customers.

255. Despite the known heightened risk to intoxicated riders, and especially intoxicated women riders, over the years, Uber has launched numerous marketing campaigns specifically promoting its product to, among others, people, including young women, who are too intoxicated to drive.

256. In 2015, Uber released a report with Mothers Against Drunk Driving that states "The Uber App was created to ensure reliable access to safe rides." The report states that with Uber, intoxicated persons can find "a safe, reliable ride home" that is "always within reach." The report further represents that

"Uber is a better late[-]night option" and reports that "93% of people would recommend Uber to a friend if they have been drinking. Not only would people take Uber themselves—they would trust Uber to take their drunk friend home safely."

257. In 2016, Uber published a video showing a large breathalyzer machine that it installed on a sidewalk in Portland, where anybody could test their blood alcohol content. If their blood alcohol was at a level unsafe for driving, Uber would provide them with a free ride. The video ended with the tagline, "A safe ride home is always just a tap away," which faded to show Uber's logo.

258. Another Uber ad campaign proclaimed: "Safe rides around the clock—Affordable, reliable transportation can help make roads safer. Need a late-night ride and can't drive yourself? Request a ride with Uber." On holidays and special occasions, Uber often advertises its rides as a safe option for intoxicated people.

259. Uber partners with alcohol manufacturers and bars to promote drinking and riding with Uber in tandem.

260. As a result of Uber's marketing, the public became convinced that it is a good and safe idea for intoxicated people, including women, to take an Uber ride. For this reason, Uber has become the go-to transportation option for intoxicated people, including intoxicated women. This has resulted in increased profits for Uber.

261. Uber's conduct cornered the market and prevented a competitor from emerging that would have provided a true public service: both preventing DUIs and addressing safety for passengers.

**xi. Uber tried not to learn about sexual misconduct on its platform.**

262. Sexual assault is an underreported crime, for a variety of reasons. It is often difficult for survivors to come forward and tell their stories. Many survivors struggle with trauma and find it inherently painful to "relive" the

incident by talking about it. Many survivors worry that they would be interrogated or subjected to other painful treatment if they came forward. Many survivors worry that they would be disbelieved if they came forward. Often sexual assault is unwitnessed, and the survivor has to carry the weight of knowing that the outcome depends entirely on the survivor's testimony. Survivors may also struggle with feelings of guilt, confusion, doubt, and self-blame. Thus, the reports of sexual misconduct by Uber passengers to Uber represent only a small fraction of the actual sexual misconduct that riders experience during Uber rides. But that conservative number was still enough to garner national attention, including the initiation of various federal and state investigations into Uber's inadequate response, management and investigation of these claims. That it took national publicity—of crimes that are historically underreported—for Uber to deign to acknowledge the problem reflects the willful disregard that Uber has regarding passenger safety and sexual assault.

263. Uber, if it wanted to learn about sexual misconduct occurring on its platform, would have encouraged reporting, including building clear methods for survivors to report sexual assault, reassuring them that they will be treated with respect and protected against retaliation, and offering supportive interactions from trauma-informed individuals.

264. Instead, Uber focused on making money, not on the safety of its riders. Therefore, it was not a priority for Uber to learn about sexual misconduct occurring within its transportation system.

265. Instead, Uber prioritized its reputation for safety— which was based on a lie—and maintaining its "critical mass" of Uber drivers and consumers.53 On reputation, Uber knows that acknowledging and publicizing reports of sexual assaults by Uber drivers would be bad for its reputation. According to Uber, "[p]ublic reporting or disclosure of reported safety information, including information about safety incidents reportedly occurring on or related

to our platform, whether generated by us or third parties such as media or regulators, may adversely impact our business and financial results." On maintaining Uber drivers, and as noted above, Uber has repeatedly acknowledged and accepted that heightened background changes would not serve its profit-based interests because the changes would "increase our costs and reduce our ability to onboard additional drivers to our platform."

266. Therefore, Uber did not encourage—and in fact discouraged—sexual assault reporting. Uber wanted to keep sexual assault hidden, and it acted accordingly. Simply put, it was not in Uber's interest to even acknowledge the incidents of sexual assaults. In order to preserve its brand reputation and massive growth, Uber intentionally turned a blind eye to what was a glaring defect in its global enterprise.

267. Uber thus fostered a system in which complaints were not encouraged (either directly through the manner in which complaints were processed, or indirectly through the provision of subpar reporting tools); proper investigations not conducted; categorization of the type and nature of assaults mismanaged; proper training and supervision for Uber drivers not provided; and, safety tools and mechanisms during a ride not initiated.

268. Uber did not build straightforward or simple ways for riders to report sexual misconduct that occurred during a ride. Instead, the features were intentionally obscured in the Uber App, making it difficult and confusing for passengers to report sexual assault.

269. Further, Uber did not provide any mechanism, or even assurances, of protection for passengers who did make a report.

270. Uber drivers often drop a rider off at home or work and therefore know where to find the rider again. Many riders who would otherwise give drivers low ratings or report sexual misconduct do not do so because they are fearful that if they make a report the driver could identify them, find them, and

potentially retaliate. But these realities were ignored by Uber. There are no protections against retaliation afforded by riders at any level of reporting—whether it be a low-star rating or a formal complaint.

271. In fact, Uber provides no transparency on the impact, if any, that a passenger's low rating or complaint would have on the Uber driver's ability to continue accessing the Uber App, which, in turn, contains the passenger's pick-up and drop-off information.

272. Even when riders report sexual misconduct, Uber does not devote sufficient resources to reasonably investigate such reports.

273. Until at least 2018, Uber assigned the job of investigating serious safety incidents, including sexual misconduct, to a small, insufficient number of employees. Until at least 2018, these employees were overworked and had too little time to investigate such reports.

274. Until at least 2018, the employees Uber assigned to respond to reported safety incidents, including sexual misconduct, were also underqualified, undertrained, and nonspecialized. Uber did not require any investigation experience or relevant safety background, and its employees assigned between 2016 to 2018 to investigate the most serious conduct including a former day care worker, former fry cook, grocery store cashier, and barista.

275. Until 2018, Uber had no formal taxonomy for tracking sexual misconduct on its platform and did not standardize how to classify sexual misconduct. Frequently, Uber investigators mislabeled sexual assault as flirtation, inappropriate comments, or inappropriate communications.

276. Until at least 2018, Uber's deficient categorizations of sexual misconduct and sexual assault limited its ability to learn about, study, and prevent sexual misconduct directed at its riders.

277. In 2021, the New York Times reported that Uber's team of purported "investigators" typically had "little to no background in trauma response…

They are given scripts to read to often-upset passengers and drivers, and strict company policies prohibit the agents from reporting the incidents to the police, even when perpetrators acknowledge their actions."

278. Critically, "[t]he agents can't even suggest that victims call the police themselves. Why? Because police reports can puncture Uber's carefully crafted safety -image – and open the company up to more lawsuits and liability." "[E]ven in the most egregious of cases – including confessions of rape, armed assaults and kidnappings – Uber won't contact authorities unless a person is in immediate and present danger."

279. To this day, Uber's deficient information gathering and investigations limit its ability to learn about, study, and prevent sexual misconduct by Uber drivers.

**xii. Despite itself, Uber learned that its riders were being sexually assaulted, but it concealed and downplayed the problem.**

280. By 2014, less than a year after Uber started onboarding non-professional drivers, it started receiving reports of sexual assault committed by Uber drivers against riders. It continued receiving these reports from 2014 to the present. Uber did not publicize what it was learning, because its goal was not safety but rather the appearance of safety.

281. But the rate and viciousness of attacks could not be concealed forever. Media outlets began to report on incidents, and victims began to speak out.

282. For example, in December 2014, a 26-year-old finance worker in New Delhi, India, hailed an Uber to take her home.60 Uber provided her with a driver who was already awaiting trial for at least four other criminal charges. When the woman fell asleep in the car, her driver raped her in the backseat.

283. Since Uber's focus was its reputation, Uber reacted by attacking the victim's credibility. Eric Alexander, Uber's President in the Asia–Pacific region and Kalanick's designated fixer, managed to obtain the rape victim's

medical records, including the exam performed within hours of her rape. Alexander shared these records with Mr. Kalanick. Many other Uber executives either saw the records or learned of them. Mr. Kalanick latched on to the fact that the victim's hymen was still intact. Despite the Uber driver's history of sexual assault and confession to the police, he began cultivating and sharing a story that the woman was not raped, but rather the whole incident was a plot against Uber by a major ride-sharing competitor in India.

284. The response to the New Delhi incident was representative of Uber leadership's approach to sexual assault generally. 68 When Uber customers accused Uber drivers of sexual assault—something that happened with increasing frequency as Uber grew, given its lax supervision and shoddy background checks—Mr. Kalanick would pace around Uber headquarters, not wondering about how to improve rider safety but repeating "innocent until proven guilty." When law enforcement decided not to bring criminal charges against an Uber driver accused of sexual assault because it felt it did not have enough evidence for a criminal conviction, "a round of cheers would ring out across the fifth floor of Uber HQ."

285. In July 2015, Uber began leasing cars to high-risk individuals with poor or nonexistence credit ratings (the "Xchange leasing program"), and noticed the rate of safety incidents spiked after, with a correlation between incidents and drivers with bad ratings.

286. Until 2018, Uber did not tell riders anything about the sexual assaults occurring during Uber rides unless it was forced to comment on an already-public news story involving sexual assault.

287. To this day, Uber has never told the public how many sexual assaults riders reported to it from 2013 to 2017, a period for which its information gathering was particularly inadequate.

288. Until 2018, Uber required confidentiality as a condition of settlement with sexual assault survivors, effectively forcing survivors to stay quiet so that the public would not learn about the true risks of riding with Uber.

289. Likewise, until 2018, Uber enforced mandatory arbitration of "sexual misconduct claims by platform users," ending the practice only due to "increasing public scrutiny."

290. In late 2018, Uber finally developed a "Taxonomy" to identify, categorize, and count incidents of sexual misconduct on its platform. It did not do this out of genuine concern for safety, but because research showed that negative views of Uber were rising in part due to public reports of rampant sexual harassment and misogyny directed at Uber's female engineers and other corporate employees, and in part due to a continued lack of transparency regarding sexual misconduct by Uber drivers in the wake of the #MeToo movement. Uber promised riders improved transparency and reporting.

291. When Uber announced a commitment to transparency in 2018, it did so for the sake of public relations. It took the position that sexual assaults on Uber's platform were merely a reflection of a society-wide problem, and not a reflection on Uber's transportation system or business practices.

292. On May 15, 2018, Uber's new Chief Legal Officer, Tony West, working with new CEO Dara Khosrowshahi, announced: "[O]ur service ultimately reflects the world in which we operate—both the good and the bad. And it's clear that sexual violence remains a huge problem globally. The last 18 months have exposed a silent epidemic of sexual assault and harassment that haunts every industry and every community. Uber is not immune to this deeply rooted problem, and we believe that it is up to us to be a big part of the solution."

293. The Taxonomy identified 21 categories of sexual misconduct or assault based on "real examples … reported to Uber":

| SEXUAL MISCONDUCT | SEXUAL ASSAULT |
|---|---|
| Staring or Leering | Attempted Touching: Non-Sexual Body Part |
| Comments or Gestures › Asking Personal Questions | Attempted Kissing: Non-Sexual Body Part |
| Comments or Gestures › Comments About Appearance | Non-Consensual Touching: Non-Sexual Body Part |
| Comments or Gestures › Flirting | Non-Consensual Kissing: Non-Sexual Body Part |
| Comments or Gestures › Explicit Gestures | Attempted Touching: Sexual Body Part |
| Comments or Gestures › Explicit Comments | Attempted Kissing: Sexual Body Part |
| Displaying Indecent Material | Non-Consensual Touching Sexual Body Part |
| Indecent Photography Without Consent | Non-Consensual Kissing: Sexual Body Part |
| Soliciting Sexual Contact | Attempted Non-Consensual Sexual Penetration |
| Masturbation / Indecent Exposure | Non-Consensual Sexual Penetration |
| Verbal Threat of Sexual Assault | |

294. Using the Taxonomy, Uber went back and tried to retroactively analyze and categorize reports of sexual misconduct reported to it from 2017 to 2018. Uber's ability to accurately do so was limited by its deficient information gathering.

295. In Uber's first Safety Report, published on December 5, 2019, Uber admitted to receiving reports of 5,981 sexual assaults (in five categories) in the United States in 2017 and 2018. These included 235 rapes, 280 attempted rapes, 1,560 groping incidents, 376 instances of unwanted kissing of the breast, buttocks, or mouth, and 594 reports of unwanted kissing to another body part.

296. The sexual assaults that Uber reported to the public represent only the tip of the iceberg. Significantly, Uber reports data on sexual assaults in only five of the categories, providing zero transparency regarding the other 16 categories of sexual misconduct and sexual assault occurring on its system. As described above, there are also inherent and Uber-created limitations that affect sexual assault reporting.

297. Uber did not voluntarily publish additional data on sexual assaults after its 2019 report.

298. On December 2, 2021, the California Public Utilities Commission (CPUC) approved a settlement agreement with Uber regarding its failure to report data on sexual harassment and assault, notwithstanding CPUC demands for it. Uber agreed to pay $9 million and to provide information on sexual assault and harassment to the CPUC on a going-forward basis.

299. It was another six months after this settlement, before Uber publicly released another safety report. In July 2022, it released a report covering 2019 and 2020 (a year when its ridership was decimated by the pandemic).

300. Despite a drastic reduction in total rides due to the pandemic (a decline of approximately 30-77% depending on the geographic region) Uber admitted in its 2022 report that it still received 3,824 reports of sexual assault (within the same five categories) in the United States in 2019 and 2020.

301. After Uber's IPO in 2019, securities laws required it to start publishing annual reports for shareholders, truthfully disclosing risks facing the company. Its 2020 Annual Report disclosed: "There have been numerous incidents and allegations worldwide of drivers, or individuals impersonating drivers, sexually assaulting, abusing, kidnapping, or fatally injuring consumers, or otherwise engaging in criminal activity while using our platform or claiming to use our platform." Uber did not publicize these same statements, or anything like them, in communications designed to reach riders.

302. Uber has not publicly released sexual assault data for years after 2020. Uber's decision to withhold that data deprives Uber passengers and the public from important information about risk and accountability.

303. Despite its efforts to discourage accurate reporting of sexual misconduct and to minimize publication of such incidents, Uber has known since 2013 that its riders were being sexually assaulted and harassed by drivers during Uber trips.

**xiii. When Uber learns of misconduct by specific drivers, it puts riders at risk to protect its product and reputation.**

304. Particularly troubling is the way Uber responds to instances of known or suspected driver misconduct.

305. To this day, when a rider gives a one-star review to a driver because of sexual misconduct, Uber makes it difficult for the rider to indicate sexual misconduct as the reason for the low rating.

306. When the rider gives a low rating, Uber presents a menu of forced-choice rationales for the low rating. The option most appropriate for sexual assault or other sexual misconduct is "Report a Safety Issue." If the rider selects this option, the Uber App will present her with another forced-choice menu with the following options: "My driver's vehicle was unsafe or broke down; I was involved in an accident; I was discriminated against by my driver; My driver drove dangerously; My driver's license plate was different; My driver didn't match the profile in my app; My driver's vehicle was different; Emergency contact information; Report a safety incident involving a driver; Safety incident reporting line.

307. Of these, the most appropriate option for someone reporting sexual assault or other sexual misconduct would seem to be, "Report a safety incident involving a driver." If the rider selects this option, Uber redirects her to another page with the following links: (1) "My driver was rude," (2) "I have a different concern about my driver or their vehicle," and (3) "worried about a cancellation fee?" Near the bottom of the page is a small, free-form field that is hard to see, and which Uber designs not to be seen.

308. The other options on the "Report a Safety Issue" main menu take riders to user friendly lists of options including: "(1) Dangerous driving – fast driving, distracted by phone, drowsy driving, swerves, sharp turns, harsh stop and go, illegal driving, aggressive driving, other; (2) Vehicle – wrong vehicle, vehicle cleanliness, unpleasant car smell, mechanical issues, vehicle damage,

disturbing radio, other; (3) Driver behavior – driver not polite, ignored my requests, communication issues, talked too much, other, distracted by phone, talking on phone; (4) Navigation – bad map route, didn't follow map, wrong turns, slow driving, other; (5) Pickup/Dropoff – wrong driver, dropoff too far, pickup too far, unsafe dropoff, unsafe pickup, wrong pin location, other."

309. There is nothing on any menu that lists "sexual assault," "sexual misconduct," "sexual harassment" or anything of the sort. This omission is by design, since Uber does not want to tell regulators or the public about rates of sexual assault.

310. Whenever a rider rates a driver with one star but does not specify a reason, Uber knows or should know there is a high probability the low rating reflects sexual misconduct but that the rider was unable to navigate Uber's menu to specify that reason or leave a comment.

311. When Uber sends a driver to a rider, the Uber App provides the rider with a picture of the driver, and with a total number of rides the driver has offered on the platform along with a star rating and a number corresponding to the star rating (out of a total of 5 stars). Uber tells riders that these ratings are designed to "help keep riders and drivers safe." It represents on its safety page that a rider can "get to know your driver before you step into their car. You can see their rating, how many trips they've completed, how long they've been driving, compliments from previous riders, and more."

312. Uber does not tell riders how many one-star ratings a driver received but only provides an average star rating. This rating system provides a false sense of assurance to women and other vulnerable riders who perceive a high average rating to indicate a safe driver. However, a driver who receives primarily positive reviews may also occasionally engage in sexual misconduct or harassing behavior. Such a driver might have a high average star rating but

a concerning pattern of one-star reviews. Uber does not share such patterns with riders.

313. Uber does not share with riders the reason for prior one-star reviews. Even when Uber knows that the prior one-star reviews were for reports of sexual assaults, it does not communicate this to riders.

314. Uber tells riders that they can "see [the driver's] rating." In reality, and unbeknownst to riders, Uber only includes the last 500 ratings in the driver's reported rating. Thus, for a typical full-time driver who provides about 50 rides per week, Uber is effectively scrubbing the driver's record every ten weeks.

315. Uber also omits ratings from riders who have a history of giving what Uber considers to be too much negative feedback and omits low ratings for certain types of feedback.

316. When riders, despite deterrent factors, manage to go beyond star ratings and report sexual assault to Uber, the ensuing investigations are designed to soothe the rider but not to hold the driver accountable.

317. Research shows that sexual assault survivors who report their assaults most often do so out of a motivation to protect others, and secondarily to bring accountability to the perpetrator. A superficially soothing interaction with an investigator that does not result in punitive action does not achieve either of these goals and indeed can be affirmatively harmful.

318. Uber's primary purpose in conducting its investigations is to protect Uber and its reputation. According to former Uber investigator Lilli Flores, Uber trained its investigators that they were there "first to protect Uber; and then next to protect the customer."

319. Until at least 2019, it was Uber's policy that, if a rider reported sexual assault by a driver, the driver would be allowed to maintain his driving privileges unless it was a second, third, or fourth sexual assault on Uber's platform or if there was "conclusive" evidence of the assault (namely a

criminal conviction, admission of fault, or video or photographic evidence). In effect, this meant that virtually no initial allegations of sexual assault were considered sufficient to revoke a driver's privileges. Uber admitted these facts in sworn testimony.

320. In the absence of so-called "conclusive" evidence (conviction, admission, video, or photo), Uber's policy to allow multiple sexual assaults before terminating a driver applied to all reports of sexual assault, no matter how credible or serious, and even if the rider's allegations were corroborated by GPS evidence showing that a driver went off route or stopped for a long time.

321. In fact, depending on how many rides a driver had given on the platform, and thus how profitable the driver was for Uber, the driver might be allowed two, three, or four sexual assaults before being terminated. Uber executives would make exceptions in order to keep dangerous drivers on the road. For example, "a New York-area driver allegedly made three separate sexual advances on riders, said an investigator assigned to the case. After an executive overruled the investigator, the driver was allowed to continue working until a fourth incident, when a rider claimed he raped her."

322. Uber has admitted in sworn, unsealed testimony that, after receiving initial allegations of sexual assault, it would temporarily suspend the driver during its investigation, then (sometimes within twenty-four hours) reactivate the driver and allow him to go pick up other riders.

323. Uber has admitted in sworn testimony that it knew that individuals who have committed sexual assault may go on to reoffend.

324. Uber has admitted in sworn testimony that it did nothing to warn or protect these other riders from drivers with a known history of sexual assault.

325. In fact, corroborative evidence was considered insufficient to result in revocation of driving privileges. Rather, the evidence had to be "conclusive."

Uber has admitted in unsealed testimony that even if GPS evidence corroborated the rider's account, the rider's account was otherwise consistent and credible, and the driver's account was not credible, it would not be enough to terminate a driver for a "first time" sexual assault.

326. Uber also will not report drivers' criminal sexual assaults and rapes to law enforcement. Uber claims that its policy not to contact law enforcement is victim-centric and designed to empower the sexual assault survivor to decide whether to press charges. However, even if the driver admits the crime to Uber in a recorded call, potentially allowing the criminal justice system to protect the public without imposing on the victim, Uber still will not report to law enforcement. This reticence demonstrates that Uber's true motivation is to reduce negative publicity. Furthermore, Uber deceives riders into thinking that Uber will convey reports of misconduct to law enforcement. Uber tells riders that it has a "law enforcement response team" that will work with law enforcement but does not explain to riders that this will occur if and only if the rider first self-reports the crime to law enforcement.

327. Uber does not encourage riders to report to law enforcement after receiving complaints, nor empowers them to do so.

328. Uber does not provide the rider with any information about how to report to law enforcement, does not explain that this can be accomplished by calling "911," and does not give or offer them any other phone numbers or information to make reporting easier.

329. Uber does not give riders the option of requesting that Uber report to law enforcement.

330. Even when riders express an interest in reporting to law enforcement, Uber does nothing to help them do so. Even when riders tell Uber they are confused and do not know how to report, Uber does not help them.

331. Uber's public position is that sexual assault survivors are responsible for reporting their own assaults to law enforcement, and that whether to report a crime is an inherently personal choice. But, of course, Uber knows that its own policies discourage such reporting and, partly as a result, most victims of sexual misconduct in Uber vehicles do not report the incidents to law enforcement.

332. Until at least 2018, when Uber communicated with drivers who had been credibly accused of sexual assault, it downplayed the nature of their assaults. For example, in 2018, it told a driver, Brandon Sherman, who had been credibly accused of kidnapping and sexual assault, that he "may have come off as flirtatious," and reactivated him, concluding: "We appreciate and value you as an Uber partner...I can confirm that your account is now active…" Uber admits it did nothing to protect other riders from Mr. Sherman. He went on to sexually assault another rider.

333. Until March of 2021, even if a driver had multiple allegations of sexual assault, or conclusive evidence of sexual assault, such that Uber deactivated the driver, it would not share this information with Lyft, its largest competitor. And until March of 2021, Uber did not try to find out from Lyft whether the driver had a prior sexual assault on Lyft's platform. Belatedly, in March of 2021, Lyft and Uber agreed to share information about the five "serious sexual assault" categories that Uber includes in its safety report, but not about other categories of sexual assault.

334. For years, Uber's conduct with respect to known or suspected sexual assaults has aimed at shielding drivers from consequences for their actions, and to downplay their crimes.

335. These policies reinforced the message that their victims will not be believed and that their sexual misconduct will not be taken seriously or result

in consequences. This empowered offending drivers to continue to engage in sexual misconduct.

336. Uber has given countless drivers with known histories of sexual misconduct access to additional victims, and given them the opportunity to prey on riders who are trusting Uber to keep them safe.

337. These policies, at all relevant times, have been initiated or maintained by Uber's leadership, including its officers, directors, and managing agents. Uber knew or should have known that failure to alter its policies and practices would result in sexual assaults and harassment committed by drivers against passengers.

**xiv. Instead of trying to prevent sexual misconduct, Uber launders its reputation.**

338. Uber has a tried and true strategy for dealing with controversy, especially those involving sexual misconduct: protect its reputation by offering limited and inadequate transparency and hiding behind the reputation of third parties.

339. In 2017, bad press about Uber was piling up due to, among other things, the New Delhi assault, reports of widespread sexual harassment among employees, and rampant misogyny and "bro culture" at the top of the company.

340. Uber's goal of going public was threatened. Uber knew it needed to clean up its image. On June 12, 2017, Uber held a company-wide meeting to announce changes. At the meeting, Uber proclaimed that it was going to increase its diversity and sensitivity by adding a female board member. Board member David Bonderman chimed in that the addition of a woman to the board meant "it's much likelier [there will] be more talking on the board." Though Mr. Bonderman soon resigned after his comments were reported, the fact that this attitude came from the person "working on Uber's culture after the company was rocked by scandals over claims of sexual harassment and other

misbehavior" demonstrates that Uber's "culture was poisoned from the very top."

341. Uber hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment. Holder's investigation uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."

342. Holder produced hundreds of pages of findings, but only Uber's board of directors ever saw the full report.

343. Uber's primary response to the Holder report was to replace its leadership—forcing out the founding generation, including Mr. Kalanick. But, while Uber presented fresh and trusted faces to the public, such as new CEO Khosrowshahi and board member Ariana Huffington, the underlying conduct and business practices did not change. Instead, the retention of Mr. Holder and the leadership "reset" merely served to cover up the continuation of the fraud that Uber cared about safety and would work to provide a safe ride.

344. As discussed above, after using Mr. Holder to burnish its image, Uber did not release any data on sexual assaults until December 2019.

345. Uber partners with third parties, often non-profits, to use their reputation to enhance its own. These include the National Sexual Violence Resource Center, the Urban Institute, and Mothers Against Drunk Driving.

346. Uber is not transparent about what data or information it provides to these organizations and what it withholds. These outside organizations also have no real ability to affect Uber's actions, as demonstrated by Uber's approach to the Covington-mandated Safety Reports.

347. Uber also coopts third parties like RAINN (Rape, Abuse & Incest National Network), to hide behind messaging about how victims can protect themselves from sexual violence. Uber does this to deflect attention away from

its own institutional responsibility to meet its promises to protect its riders. Uber donates millions of dollars annually to RAINN and similar nonprofit organizations, so that Uber can appear committed to safety, so that these groups will have a conflict that prevents them from criticizing Uber or opposing it as amicus in court), and also so that Uber can influence the messages put out by those groups. On the other hand, Uber gives those groups no real influence over the way Uber does business.

348. Indeed, Uber's partnership with safety-oriented organizations only underscores that it has voluntarily undertaken the duty to ensure a safe ride.

349. While Uber hides behind third parties who have no power to investigate the real and complete truth of Uber's approach to sexual misconduct, and no power to alter that conduct, Uber's attitude towards courts and regulators—those actually in a position to modify Uber's conduct—is very different.

350. For an unknown period of time, Uber deliberately deleted internal communications. The company included an entity called the "Strategic Services Group" that engaged in competitive intelligence and other unknown activities.92 Internal communications within the Group were carried out using an app called Wickr. Wickr automatically deleted messages after a certain period of time, preventing future legal discovery. The group's practices may also have included improperly designating documents as attorney-client privileged.

351. "Employees were unnerved by mass deletion of internal emails, groups chats, and company data, carried out under an internal initiative to 'eliminate data waste' throughout all levels of the company. Internally, many believed executives wanted to cover Uber's tracks, anticipating a subpoena for some unknown future court case."

352. Uber regularly flouts transparency demands placed on it by courts and regulators. Uber refused to comply with CPUC document demands for months,

leading to the regulator imposing a $59,085,000 fine (reduced after settlement), and threatening to revoke Uber's license.

353. Uber has also been sanctioned by a Washington court for defying court orders, including attempt[ing] to reinterpret a "discovery order" that "was clear on its face." The court found that "[g]iven the history of non-compliance in this case, fees and costs are not enough. Punitive sanctions are warranted."

354. Also in 2019, Uber skipped a congressional hearing aimed at examining its safety and labor practices. This was after the Committee on Transportation and Infrastructure had repeatedly sought Uber's participation. Uber, instead, "suggested that [the committee] invite third party industry associations to generally talk about technology innovation in transportation."

355. At the time that the Plaintiff was being transported by Uber, she was a minor and Uber's own California policies and Terms prohibited unaccompanied minors from using Uber's platform. Uber/Rasier-CA expressly represented to the CPUC that users had to be at least 18 to obtain an account; that persons under 18 could not receive transportation services unless accompanied by the account holder; that California riders and drivers were notified that unaccompanied minors were prohibited from traveling with TNCs; and that drivers should cancel rides when they determined the rider was under 18.

356. In Nevada, Uber's own Terms, policies, and driver rules prohibited unaccompanied minors from using Uber's platform. Uber required account holders to be at least 18 and prohibited account holders from allowing minors to receive transportation services unless accompanied by the account holder. Uber also instructed drivers not to transport unaccompanied minors and could terminate access for minors or adult account holders who violated the rule.

## PUNITIVE DAMAGES

357. Plaintiff seeks punitive or exemplary damages.

358. Uber acted intentionally, recklessly, wantonly, maliciously, and fraudulently.

359. As alleged above, Uber knew it faced an ongoing problem of its drivers assaulting or harassing its passengers. As early as 2014, Uber knew that its drivers were sexually assaulting or harassing women or other vulnerable passengers. Since 2014, Uber has received frequent passenger complaints about driver sexual misconduct, including sexual assault and rape, it has been repeatedly notified of police investigations of the criminal sexual conduct of drivers acting within their capacity as Uber drivers, and it has been the subject of numerous civil suits and arbitrations alleging the sexual harassment and sexual assault of Uber's passengers by Uber's drivers.

360. Nevertheless, even though Uber was fully aware of its sexual misconduct problem it failed to take safety precautions to protect its passengers. Even after Uber was aware of widespread sexual misconduct on the part of its drivers, Uber and its executing officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them.

361. The decision not to implement more thorough and persistent background checks was driven by Uber executives' desire for rapid expansion and increased profits, because the more drivers driving for Uber, the more money there was to be made.

362. Prioritizing profits over safety, Uber and its executive officers also made the conscious decision not to warn its customers or users of the risk of being assaulted, even after Uber and its leadership were fully aware of this risk.

363. Safety precautions such as enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; ongoing

monitoring of Uber drivers and rides through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers or by deviating substantially from the assigned route; a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride; a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers; creating and instituting a system encouraging customer reporting; adequate monitoring of customer complaints by well-trained and effective customer-service representatives; warnings to passengers of the dangers of being attacked by Uber drivers; and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage. Because of this, Uber, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its passengers at greater risk of kidnapping, sexual assault, harassment, rape, and exploitation by Uber's own drivers.

364. Prioritizing profits over passenger safety, Uber and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its passengers, including that of Plaintiffs and the public.

365. Uber also misrepresented the safety of its rides to Plaintiffs and the public, intentionally and actually inducing reliance on those statements and omissions.

**FIRST CAUSE OF ACTION: TVPRA**

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 U.S.C. § 1595 (against all defendants).

366. The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

367. Thus, the federal sex trafficking statute consists of four elements: (a) the defendant knowingly benefited, (b) from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant knew or should have known the venture violated the statute.

368. Plaintiff was a victim of conduct prohibited by 18 U.S.C. § 1591.

369. The Trafficker knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and solicited Plaintiff for prohibited commercial acts while knowing, or in reckless disregard of the fact, that Plaintiff was under eighteen and/or subject to coercive control.

370. Uber knowingly benefited financially and by receiving things of value from participation in a venture that Uber knew or should have known was engaged in violations of the TVPRA.

371. The venture included the Trafficker, buyers, online advertising, hotels, residences, transportation services, and related commercial systems that enabled Plaintiff's exploitation.

372. Uber participated in the venture by repeatedly providing transportation services necessary to move Plaintiff to locations connected with the enterprise.

373. Uber's participation was not isolated or incidental. Uber repeatedly connected drivers, accounts, payments, locations, and riders in a manner that enabled the enterprise to function.

374. Uber's platform was used to transport Plaintiff while she was under eighteen, unaccompanied, visibly vulnerable, and not the account holder.

375. Uber drivers observed obvious indicators of exploitation and nevertheless completed the rides.

376. Some Uber drivers directly solicited Plaintiff and participated in unlawful conduct involving Plaintiff while she was under eighteen.

377. Uber knew or should have known of the trafficking venture based on driver observations, repeated ride patterns, third-party account use, suspicious destinations, public warnings, prior incidents, internal data, and foreseeable risks created by its own policies and incentive structures.

378. Uber knowingly benefited by receiving fees and revenue from rides connected to Plaintiff's trafficking.

379. Uber's acts and omissions were a direct and proximate cause of Plaintiff's injuries.

380. Plaintiff is entitled to damages, attorneys' fees, costs, and all other relief available under 18 U.S.C. § 1595.

## SECOND CAUSE OF ACTION: CAVRA

Child Abuse Victims Rights Act ("CAVRA")

18 U.S.C. § 2255 (against all defendants)

381. Federal law provides civil remedies for victims of child exploitation by way of a statute commonly referred to as "Masha's Law." The statute provides a cause of action for minors who were victims of a violation of enumerated federal laws, including 18 U.S.C. § 1591.

382. Defendants knowingly benefited from harboring Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing transportation to facilitate the sexual rendezvous where they knew that Plaintiff, a minor, would be engaged in commercial sex acts.

383. Plaintiff incorporates all preceding paragraphs.

384. Plaintiff was under eighteen during a substantial portion of the conduct described herein.

385. Plaintiff was a victim of conduct violating federal statutes enumerated in 18 U.S.C. § 2255, including but not limited to 18 U.S.C. § 1591.

386. The Trafficker violated § 1591 by recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, and soliciting Plaintiff for prohibited commercial acts while Plaintiff was under eighteen and subject to coercive control.

387. Certain Uber drivers also violated § 1591 and/or aided, facilitated, patronized, solicited, or participated in Plaintiff's exploitation while she was under eighteen.

388. These drivers used their role as Uber drivers to access Plaintiff, observe her vulnerability, transport her to locations connected with the enterprise, solicit unlawful commercial activity, and in some instances participate directly in the unlawful conduct.

389. At relevant times, Uber drivers acted under Uber's platform rules, compensation system, dispatch structure, and performance metrics.

390. Uber controlled material aspects of the driver relationship, including access to the platform, dispatch, pricing, payment, ride assignment, cancellation consequences, account rules, driver conduct policies, and deactivation authority.

391. Uber is liable under CAVRA because Plaintiff was a child victim of predicate federal offenses and suffered personal injury as a result of the conduct described herein.

392. Uber is further liable through its own acts and omissions, including facilitating transportation, failing to enforce safety policies, creating incentives to ignore warning signs, and financially benefiting from rides that enabled the unlawful conduct.

393. Uber is also liable under principles of agency, apparent agency, ratification, and vicarious responsibility for the conduct of drivers who used Uber's platform, authority, access, and transportation services to exploit Plaintiff.

394. Uber ratified or tolerated the foreseeable conduct by maintaining systems that discouraged cancellation, failed to enforce restrictions involving minors and account misuse, and continued to profit from rides under circumstances indicating risk.

395. Plaintiff suffered personal injuries as a direct result of the predicate violations and Uber's role in enabling, facilitating, and benefiting from the conduct.

396. Plaintiff is entitled to actual damages, statutory minimum damages where applicable, attorneys' fees, costs, and all other relief available under 18 U.S.C. § 2255.

397. Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

**THIRD CAUSE OF ACTION**

Civil Sexual Battery — California Civil Code § 1708.5 & Nevada Common Law

Respondeat Superior, Agency, Apparent Agency, Vicarious Liability, and/or Nondelegable Duty

(against all defendants)

398. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

399. At all relevant times, Defendant Uber Technologies, Inc. and/or its affiliated entities, including but not limited to Rasier, LLC and/or Rasier-CA, LLC, operated, controlled, managed, supervised, and profited from the Uber rideshare platform through which Plaintiff was matched with and transported by an Uber driver.

400. At all relevant times, the Uber driver was acting as Uber's actual agent, ostensible agent, employee, servant, representative, and/or authorized transportation provider while using Uber's platform to accept Plaintiff's ride request, pick Plaintiff up, transport Plaintiff, control the route and vehicle environment, and exercise authority over Plaintiff during an Uber-arranged ride.

401. Plaintiff reasonably believed that the driver was acting on behalf of Uber because Uber held the driver out as an authorized Uber driver, matched Plaintiff with the driver through the Uber platform, identified the driver and vehicle as part of the Uber ride, processed or facilitated payment for the ride, controlled material aspects of the ride transaction, and required the driver to perform the ride through Uber's app-based system, rules, policies, procedures, and standards.

402. During the Uber-arranged ride, the Uber driver sexually assaulted Plaintiff and intentionally caused harmful, offensive, and sexually offensive contact with Plaintiff, including contact with intimate parts of Plaintiff and/or

contact accomplished by the driver's intimate parts, without Plaintiff's consent.

403. The driver's conduct constituted sexual battery within the meaning of California Civil Code § 1708.5.

404. The sexual battery occurred during the course of an Uber-arranged ride, while the driver was performing transportation services obtained, arranged, controlled, and monetized by Uber, and while the driver was using the instrumentalities, apparent authority, access, trust, and passenger-control relationship created by Uber.

405. Uber is vicariously liable for the driver's sexual battery under principles of respondeat superior, actual agency, apparent agency, ostensible agency, and/or nondelegable duty.

406. Uber is further liable because the driver's ability to isolate, transport, control, and sexually assault Plaintiff arose directly from the Uber ride relationship that Uber created, controlled, facilitated, and profited from.

407. At all relevant times, Uber owed passengers, including Plaintiff, duties arising from its role in arranging and providing passenger transportation, including duties to protect passengers from foreseeable misconduct by drivers whom Uber selected, onboarded, authorized, retained, presented to the public, and permitted to transport passengers through its platform.

408. To the extent Uber contends that the driver was an independent contractor, Uber nevertheless remains liable because Uber held the driver out as its authorized transportation provider, Plaintiff reasonably relied on that representation, and Uber's passenger-safety duties were nondelegable under the circumstances.

409. Uber also ratified the driver's conduct and/or the risk-producing system that enabled the assault by knowingly maintaining policies, practices, driver-access procedures, and safety protocols that allowed drivers to use the Uber

platform to isolate and abuse vulnerable passengers, while continuing to profit from the transportation system that created the risk.

410. As a direct and proximate result of the sexual battery committed by Uber's driver, and Uber's legal responsibility for that conduct, Plaintiff suffered physical injury, emotional distress, humiliation, fear, anxiety, trauma, loss of dignity, loss of bodily autonomy, and other damages according to proof.

411. The driver's conduct was willful, malicious, oppressive, fraudulent, and despicable, and was committed with a conscious disregard for Plaintiff's rights and safety. Uber is liable for punitive damages to the extent permitted by law, including based on ratification, authorization, knowledge, conscious disregard, managing-agent conduct, and/or other facts established through discovery.

412. Plaintiff therefore seeks compensatory damages, general damages, special damages, punitive damages, costs of suit, prejudgment interest, and all other relief the Court deems just and proper.

## PRAYER FOR RELIEF

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for actual, general, special, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with restitution and disgorgement of all ill-gotten gains, costs of suit, prejudgment interest, post-judgment interest, attorneys' fees pursuant to 18 U.S.C. § 1595, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

**JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

POTTER HANDY, LLP

Dated: June 05, 2026 By: /s/ Mark Potter .
Mark Potter
Attorneys for Plaintiff